UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  1:17-CR-00153-TH |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Beaumont, Texas |
| | ) | |
| ARTURO ELIZONDO, | ) | Monday, February 26, 2018 |
| RICARDO AVILES, | ) | |
| CYNTHIA LOPEZ, | ) | (2:56 p.m. to 3:59 p.m.) |
| SIDNEY ANTHONY WORRELL, | ) | (4:03 p.m. to 4:17 p.m.) |
| | ) | (4:40 p.m. to 4:51 p.m.) |
| Defendants. | ) | |


DETENTION HEARING

BEFORE THE HONORABLE KEITH F. GIBLIN,
UNITED STATES MAGISTRATE JUDGE


<u>APPEARANCES</u>:          (CONTINUED ON PAGE 2)

For Plaintiff:          CHRIS RAPP, ESQ.
                        Assistant United States Attorney
                        350 Magnolia
                        Suite 150
                        Beaumont, TX 77701

For Arturo Elizondo:    NORMAN SILVERMAN, ESQ.
                        917 Franklin, 4th Floor
                        Houston, TX 77002

Deputy Clerk/ECRO:      Sherre White

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES FOR:**          (CONTINUED)


Ricardo Aviles:          RUSSELL J. WRIGHT, ESQ.
                         P.O. Box E
                         Silsbee, TX 77656

Cynthia Lopez:           JOHN D. MC ELROY, ESQ.
                         Federal Public Defender's Office
                         350 Magnolia, Suite 117
                         Beaumont, TX 77701

Sidney Worrell:          MARK W. BENNETT, ESQ.
                         Bennett & Bennett
                         917 Franklin St., 4th Floor
                         Houston, TX 77002

## INDEX

| GOVERNMENT'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JAMES EMMERSON | | | | |
| BY MR. RAPP | 5 | | 31 | |
| BY MR. SILVERMAN | | 14 | | 33 |
| BY MR. WRIGHT | | 17 | | |
| BY MR. MC ELROY | | 19 | | |
| BY MR. BENNETT | | 27 | | |
| | | | | |
| DEFENDANT AVILES' WITNESS | | | | |
| THELMA OROZCO | 39 | 43 | | |
| DEFENDANT ELIZONDO'S WITNESS | | | | |
| CLAUDIA ELIZONDO | 46 | 51 | | |
| DEFENDANT LOPEZ'S WITNESS | | | | |
| MARIA ZAVARY | 54 | 59 | | |
| DEFENDANT WORRELL'S WITNESS | | | | |
| GLORIA WORRELL | 62 | 64 | 65 | |

| DEFENDANT ELIZONDO'S EXHIBITS | | | | RECEIVED |
|---|---|---|---|---|
| 11 through 14 | | | | 47 |
| 1 through 10 | | | | 51 |
| COURT'S EXHIBITS | | | | RECEIVED |
| 1 through 5 | | | | 4 |
| | | | | |
| RULING OF COURT | 67 | | | |

1          **Beaumont, Texas; Monday, February 26, 2018; 2:56 p.m.**

2                              **(Call to Order)**

3          **THE COURT:**  Okay, we're back on the record in the

4    case of *United States of America versus Arturo Elizondo,*

5    *Ricardo Aviles, Cynthia Lopez, and Sidney Worrell.*

6          We're here today -- we've conducted the arraignments.

7    We're here today for the detention hearing in each of these

8    cases.

9          The Court, as it does in every case, will admit the

10   indictment into the record as Court's Exhibit Number 1.  And

11   also the Pretrial Services Reports, with the exception of the

12   recommendation by the probation officer, into the record as,

13   for Mr. Elizondo, it will be Court's Exhibit Number 2; for

14   Mr. Aviles, it will be Court's Exhibit Number 3; for

15   Ms. Lopez, it will be Court's Exhibit Number 4; and for

16   Mr. Worrell, it will be Court's Exhibit Number 5.  But I will

17   not admit the recommendation of the probation officer because

18   that is the Court's decision.

19         I'll also admit them under seal because they contain

20   personal information regarding each of Mr. Elizondo,

21   Mr. Aviles, Ms. Lopez, and Mr. Worrell.

22      **(Court's Exhibits Numbers 1 through 5 were received in**

23   **evidence)**

24         Okay, is the Government ready to proceed?

25         **MR. RAPP:**  Yes, your Honor.

1          **THE COURT:**  Please call your first witness.

2          **MR. RAPP:**  The Government calls Task Force Officer

3    James Emmerson.

4               **JAMES EMMERSON, GOVERNMENT'S WITNESS, SWORN**

5          **THE COURT:**  Thank you.  Please have a seat.

6          You can proceed.

7          **MR. RAPP:**  Thank you, your Honor.

8                          **DIRECT EXAMINATION**

9    **BY MR. RAPP:**

10   Q    Good afternoon, TFO Emmerson.  Can you explain your

11   background to the Court?

12   A    My name is James Emmerson, with two M's; E-M-M-E-R-S-O-N.

13   I'm a Galveston police officer; been a police officer for 15

14   years, and I've been assigned to the DEA Galveston Resident

15   Office for eight years.

16   Q    And how did you first become involved in this particular

17   case; how did it start?

18   A    In December 2013, I debriefed a cooperating -- or a

19   confidential informant.  The informant told me about the drug

20   trafficking activities of Alvaro Romero.

21   Q    Okay, so once you learned -- once Alvaro Romero was on

22   your radar, what happened from there?

23   A    We opened the investigation; we did the traditional

24   investigative techniques such as surveillance, phone tolls, we

25   had some recorded calls, and we did, I believe, two controlled

1  purchases of marijuana from Alvaro Romero.

2  Q    And after those two controlled purchases, did you use an

3  investigative technique known as a "wiretap"?

4  A    Yes, sir.  I obtained a wiretap, I believe, in February of

5  2014, on Alvaro Romero.

6  Q    Okay, and from Alvaro Romero, did that take --

7          **THE COURT:**  What was that -- what was date again?

8          **THE WITNESS:**  I believe in February of 2014.

9          **THE COURT:**  2014?

10 **BY MR. RAPP:**

11 Q    Okay, and at that point, did the wire interception of

12 Mr. Romero's phone lead you to other individuals?

13 A    Yes, sir, several.

14 Q    Okay, and let's go through the ones we have seated before

15 us; let's talk about Mr. Elizondo.  What, if anything -- what

16 evidence did we gain from that to get us to Mr. Elizondo?

17 A    Throughout the wiretap -- in fact, there was multiple

18 wiretaps on Alvaro Romero's phone.  We intercepted several

19 calls with Arturo Elizondo.  Elizondo was identified as a

20 cocaine source of supply for Mr. Romero.

21 Q    Okay, and what sort of amounts are we talking about

22 through the course of the wiretap?

23 A    Anywhere ranging from 9 ounces, half kilograms of cocaine,

24 to 1 full kilogram of cocaine.

25 Q    Okay, and just as a ballpark figure for Mr. Elizondo,

1   what -- do we have like a -- a ballpark figure of total amount

2   of cocaine that he was involved with through the course of the

3   wiretaps?

4   A    Yes, sir.  Between the wiretaps not only on Alvaro

5   Romero's phone, but the wiretaps we obtained on Arturo

6   Elizondo's phone, it was a ballpark figure of approximately

7   19 kilograms of cocaine.

8   Q    All right.  And were there other narcotics involved

9   besides cocaine or powder cocaine on the wire receptions?

10   A    Yes, sir; marijuana.

11   Q    And what's there -- or kind of ballpark amounts that was

12   discussed or seized through the course of wire interception?

13   A    Approximately over several hundred pounds of marijuana.

14   Q    Okay, were there any direct purchases or seizures

15   involving Mr. Elizondo?

16   A    No, sir.

17   Q    Okay, let's move on to Mr. Aviles.  Was he also involved

18   as being connected to Mr. Alvaro Romero?

19   A    Yes, sir, to the investigation; not directly to Alvaro

20   Romero.

21   Q    And just talk -- talk to us about how he became part of

22   your investigation?

23   A    Yes, sir.  We obtained the wiretap, obviously, in the very

24   beginning of the investigation, on Alvaro Romero; then led us

25   to spin up on a wiretap on Arturo Elizondo; and from him, we

1   spun up to his cocaine source of supply, which was Jose Rubio,

2   also known as "Scrappy".

3           We obtained a wiretap on Jose Rubio's phone and

4   intercepted Mr. Aviles; and we spun up on a wiretap on

5   Mr. Aviles' phone.

6   Q    Okay, and what, if anything, did you learn from that

7   wiretap about Mr. Aviles' involvement in the conspiracy?

8   A    He was a much larger cocaine distributor.  I believe a

9   ballpark figure from all the wiretaps combined, it was about 79

10  kilograms of cocaine.

11  Q    Were there any other narcotics involved with Mr. Aviles?

12  A    Not that I can recall.

13  Q    Were there any seizures or hand-to-hand purchases, like

14  powder on the table for Mr. Aviles?

15  A    Yes, sir, 10 kilograms of cocaine.

16  Q    And tell us about this incident.

17  A    There's an incident where Jose Rubio was attempting to

18  obtain 10 kilograms of cocaine for the other co-defendant,

19  Sidney Worrell.

20          During the 10-kilogram transaction, Mr. Rubio had

21  contacted his source of supply, Mr. Aviles, and attempted to

22  obtain 10 kilograms of cocaine for, I believe, it was 267,000.

23          Mr. Aviles brokered the transaction with an

24  individual; we don't know his full name, only his nickname,

25  "Churro" (phonetic).

1        We conducted surveillance throughout that entire

2  incident, observed Mr. Rubio obtain the 10 kilograms of

3  cocaine, and as he was transporting it to Mr. Worrell's house,

4  we pulled him over and seized the 10 kilograms.

5  Q    And just -- I know this was several years back, but what

6  was the approximate time frame of this seizure?

7  A    Summertime of 2014.

8  Q    Okay, let's move on to Ms. Lopez -- or back -- backing up

9  to Mr. Aviles, was there an arrest recently in this case?

10  A    Not that I can recall.

11  Q    Was a search warrant performed at a residence?

12  A    Yes, sir.

13  Q    Involving Mr. Aviles?

14  A    Yes, sir.  I obtained a search warrant for Mr. Aviles'

15  residence in Channelview, Texas, last Wednesday.

16  Q    Okay.  What, if anything, was recovered of evidentiary

17  value during that search warrant?

18  A    I believe two firearms were recovered.

19  Q    Okay, and what were the nature of the firearms?

20  A    I'm sorry?

21  Q    What were the nature of the firearms?

22  A    I don't recall what kind of firearms they were; I believe,

23  pistols.

24  Q    Okay, and is Mr. Aviles allowed to possess firearms

25  because of his criminal history?

1  A    No, sir.  He's a convicted felon.

2  Q    Okay, let's move forward to Ms. Cynthia Lopez.  Was she

3  involved in the overall conspiracy through the course of your

4  investigation?

5  A    Yes, sir.

6  Q    And explain to the Court how she kind of ended up on your

7  radar?

8  A    We identified Cynthia before the wiretaps began.  She was

9  the boyfriend -- common-law wife, father -- or mother of Alvaro

10  Romero's child.  We identified her on phone tolls; like I said

11  before, we obtained a wiretap on Mr. Romero's phone.

12         We observed she was traveling to Brownsville, Texas,

13  I can't recall, but it was several times a month, if not at

14  least twice a month.

15         We then believe she was a courier.  Once we obtained

16  a wiretap on Mr. Romero's phone, we confirmed and corroborated

17  that Ms. Lopez was a courier for -- for their organization.

18  Q    Okay, were there any seizures where she would -- involving

19  her?

20  A    Yes, sir.  We seized 7 kilograms of methamphetamine when

21  she transported from Brownsville, Texas, to Houston, Texas.

22  Q    Do you have any idea about the purity of this

23  methamphetamine?

24  A    I don't recall.

25  Q    Okay, let me ask you this:  Was she involved in any sort

1   of monetary transfers involved in the conspiracy?

2   A    Yes, sir.

3   Q    Tell us about that.

4   A    Several times -- like I said, she was a courier for

5   Mr. Romero.  She would meet other co-defendants, either to

6   distribute marijuana or cocaine, and she would receive the

7   money in exchange and transport it back to Mr. Romero and

8   ultimately back to Brownsville, Texas.

9   Q    Okay, and would that -- so the currency would be

10  transferred from one person to the other?

11  A    She would handle the actual physical work of driving and

12  transporting it.

13  Q    Okay, and did that further the, I guess, movement of the

14  currency from being drug proceeds into, I guess, other sources?

15  A    Yes, sir.

16  Q    Okay, did she have any involvement with powder cocaine as

17  well?

18  A    Yes, sir.  During intercepted calls on Alvaro Romero's

19  phone, and I believe also the other co-defendant, Miguel

20  Rodriguez, I believe the ballpark figure was around 12

21  kilograms of methamphetamine and 1 kilogram of cocaine.

22  Q    Okay, this is in addition to the -- what was seized --

23  A    Yes.  And there's --

24  Q    -- in casework?

25  A    -- several hundred, I believe, 2, 300 pounds of marijuana

1    that she distributed also.

2    Q    Okay, was a search warrant conducted recently at her

3    residence?

4    A    Yes, sir.

5    Q    And tell the Court about that.

6    A    We seized -- seized an additional I believe 108 pounds of

7    marijuana.

8    Q    And when was this?  When did --

9    A    This was --

10   Q    -- this happen?

11   A    -- I'm sorry -- last Wednesday a search warrant obtained

12   for her house in Houston, Texas.

13   Q    Okay, let's move forward to Mr. Worrell.  Was he also part

14   of this conspiracy with -- involving Alvaro Romero?

15   A    Yes, sir.

16   Q    And tell us how he came onto your radar.

17   A    Him and his wife -- or his common-law wife, Maria

18   Barragan (phonetic) -- on the wiretap, they refer to her as

19   "Becky."  They were obtaining multi-kilos of cocaine from Jose

20   Rubio, also known as Scrappy, who we had the wiretap on.

21   Q    Okay, and so what was -- was there any incident with

22   powder on the table involving Mr. Worrell?

23   A    Yes, sir.  The 10 kilograms of cocaine that I spoke of

24   with Mr. Aviles, the 10 kilograms of cocaine that Mr. Rubio had

25   obtained from the guy we only know as Churro, was destined for

1  Mr. Worrell.

2  Q    Okay.  Let me ask you this.  Was there a search warrant in

3  2014 at a residence belonging to Jose Rubio-Villegas?

4  A    Yes, sir.

5  Q    And tell us, did that involve Mr. Worrell in some way?

6  A    Yes, sir.

7  Q    And tell the Court about what happened there.

8  A    We arrested Mr. Rubio a day after the 10 kilograms of

9  cocaine seizure, and we set up surveillance as residents while

10  we went to go obtain a search warrant.

11       While conducting surveillance, investigators observed

12  Mr. Worrell show up and place a note on the front door.

13       After I secured the search warrant and we executed

14  it, we obtained the note that he had placed on the front door,

15  and it said, "Call me", and I believe "Southwest Sid," which is

16  an alias known for him.

17  Q    Okay.  Did it reference any sort of past narcotic

18  activity?

19  A    The note?  No, sir.

20  Q    All right.

21       **MR. RAPP:**  I have no further questions, your Honor.

22       **THE COURT:**  Okay, Mr. Silverman?

23       **MR. SILVERMAN:**  Yes, your Honor.

24  //

25  //

1                          **CROSS EXAMINATION**

2    **BY MR. SILVERMAN:**

3    Q    Agent Emmerson, I'm Norm Silverman.  I represent Arturo

4    Elizondo.

5    A    Yes, sir.

6    Q    I understand that you first ran across Arturo Elizondo

7    when you picked him up on a Title III wiretap where you were

8    listening in on Alvaro Romero's phone?

9    A    Yes, sir, correct.

10   Q    All right.  And that was a wiretap that was procured by

11   you in February of 2014; is that right?

12   A    I believe so.  I don't remember the exact date.

13   Q    All right.  And through monitoring the calls on that

14   wiretap, you indicate that you learned that Mr. Elizondo was

15   buying cocaine?

16   A    No, sir.  A source of cocaine.

17   Q    A source of cocaine, all right.  And you had no controlled

18   buys from Mr. Elizondo; is that right?

19   A    Yes, sir, no controlled buys.

20   Q    All right.  And the informant didn't give you information

21   about Mr. Elizondo; is that right?

22   A    Correct, no information from the informants.

23   Q    And so how did you identify Mr. Elizondo?

24   A    I'd have to go back and look at the reports.

25   Q    Okay, but you're confident that you identified him as

1  being the person you were hearing on the telephone?

2  A    Yes, sir.

3  Q    All right.  So based on what you had heard, he was already

4  responsible for some quantity of cocaine?

5  A    Yes, sir, from the wiretaps.

6  Q    All right.  And what quantity was that?

7  A    I believe it was 19 kilograms of cocaine, approximately.

8  Q    And that was just based on the -- on the first wiretap of

9  Alvaro Romero?

10 A    I don't have a breakdown for each wiretap, but for the

11 wiretaps in total from December 2013 to, I believe it was July

12 2014, 19 kilograms of cocaine.

13 Q    All right.  And how many wiretaps are there here?

14 A    Over ten, I believe.

15 Q    Okay, and, I mean, some of those, you're going to be going

16 back up on the same person's phone --

17 A    Yes, sir.

18 Q    -- more than once.

19 A    Some of them are the same individual.

20 Q    How many discrete individual phones were wiretapped?

21 A    I don't recall.  I'd have -- I could maybe go through it

22 in my head if you need me to.

23 Q    Yeah.

24 A    I believe five or six.  Some of them we obtained a

25 wiretap, got court approval, but the phone was either

1    discontinued either during the process or immediately after

2    signing.  So there's a few that I can't recall.  But I believe

3    five or six.

4    Q    Okay.  And so are you saying that just based on the Alvaro

5    Romero wiretap, you'd already established probable cause to

6    arrest Arturo Elizondo?

7    A    We established probable cause to obtain a wiretap on his

8    phone.

9    Q    Did you have probable cause to make an arrest?

10   A    I believe so.  There was more than enough cocaine that he

11   had distributed to Alvaro Romero.

12   Q    Okay, and how do you know that that cocaine was actually

13   distributed?

14   A    Through the wiretaps, either afterwards -- the

15   confirmation, money payment, or phone calls that Mr. Elizondo

16   made afterwards.

17   Q    Did you see Mr. Elizondo paying money?

18   A    Paint?

19   Q    Paying money?

20   A    No, not physically see him.

21   Q    Okay.  Were you able to conduct surveillance on

22   Mr. Elizondo?

23   A    Yes, sir.

24   Q    And were you able to conduct surveillance on Mr. Elizondo

25   before you obtained a wiretap on his phone?

1   A    Yes, sir.

2   Q    All right.  So you definitely knew who Mr. Elizondo was?

3   A    Yes, sir.

4   Q    All right.  Did you know where he lived?

5   A    I knew where he was conducting his drug transactions.

6   Q    All right.  And you were able to watch that occur?

7   A    Yes, sir.

8   Q    All right.

9        **MR. SILVERMAN:**  Pass the witness.

10       **THE COURT:**  Any further questions regarding his

11  questions?

12       Let me -- let's do it this way.  Let me go ahead and

13  call the other Defendants' attorneys, and then we'll do a wrap

14  up Redirect.

15       Mr. Wright?

16                    **CROSS EXAMINATION**

17  **BY MR. WRIGHT:**

18  Q    Mr. Emmerson, I'm Russell Wright.  I'm representing

19  Mr. Aviles.

20  A    Yes, sir.

21  Q    Would you recount the 10k buy of coke in the summer of

22  '14?

23  A    Yes, sir.  We intercepted on the wiretap on Jose Rubio, he

24  was attempting to obtain 10 kilograms of cocaine.  He contacted

25  his cocaine source supplier which was Mr. Aviles.

1          Mr. Aviles brokered the transaction with an

2     individual we only know as Churro.  If I recall, the address

3     that Mr. Aviles directed Mr. Rubio to go to was off of Biggs

4     (phonetic) Street, 6703 -- numbers are somewhere around that --

5     off Biggs.

6          Mr. Rubio showed up.  We intercepted a call from

7     Mr. Aviles.  He was making sure that Mr. Rubio had arrived, and

8     Mr. Rubio was asking Mr. Aviles is -- make sure that cocaine

9     was all there.  And he confirmed that it was.

10         We saw Mr. Rubio go inside the residence, leave, and

11    on his way to Mr. Worrell's residence, we had him pulled over

12    and seized the 10 kilograms.  It was in the trunk of, I

13    believe, a Dodge Challenger that Mr. Rubio was driving.

14    Q    And you may have said this, but what number was the

15    wiretap on that you gained this information from?

16    A    I can't recall the exact phone number.

17    Q    Not the number, but whose phone was it?

18    A    Mr. Rubio's -- Jose Rubio.

19    Q    Okay.  Now, how did you identify Mr. Aviles?

20    A    I can't recall.  I'd have to go back to the reports.

21    Q    Okay, so your initial confidential informant did not

22    directly tie him to this conspiracy, correct?

23    A    No, sir.  We had no confidential informants that talked to

24    Mr. Aviles.

25    Q    Okay, and how did you come up with the figure of 79 keys

1   for Mr. Aviles?

2   A    I didn't come up with it.  The other investigators and

3   analysis -- analyst in this case went through the wiretaps and

4   all the transactions that appeared to have been completed over

5   the wire -- or wiretaps came up with the ballpark figure of 79

6   kilograms.

7   Q    And that would have been from February of '14 through

8   sometime of the summer of '14?

9   A    The entire length of the investigation, yes, sir.

10  Q    Did you have any surveillance set up on Mr. Aviles?

11  A    Yes, sir, several times.

12  Q    And during any of these transactions?

13  A    Yes, sir.

14          MR. WRIGHT:  I pass the witness, your Honor.

15          THE COURT:  Okay, Mr. McElroy?

16          MR. MC ELROY:  Thank you, your Honor.

17                      CROSS EXAMINATION

18  BY MR. MC ELROY:

19  Q    Agent Emmerson, how long did you take to prepare for the

20  hearing today to come up with these summaries that you're

21  presenting to our clients -- regarding our clients in this

22  hearing?

23  A    I never came up with the actual summaries -- the

24  punishment (phonetic) summaries.  That would be my partner that

25  did that.

1  Q    Okay, so you're one of the investigators that's involved

2  in this case --

3  A    Yes, there's --

4  Q    -- not the only?

5  A    Yeah, concerning there -- it was a large investigation;

6  there were several investigators and analysts that helped with

7  the case.

8  Q    So the information you're relating to the Court isn't

9  necessarily something you personally observed or personally

10 reviewed, but rather something somebody else may have done?

11 A    Not in all cases, but, yes, in some cases it is.

12 Q    Can you distinguish between what you've said so far what

13 was yours and what was somebody else's, or does it all kind of

14 run together at this point?

15 A    If you could break it down and ask me each specific

16 incident --

17 Q    Yeah?

18 A    -- I can tell you whether I was there or not.

19 Q    Well, I represent Ms. Lopez in this case, and I'm

20 concerned about her at this point.

21        The allegation is that there was a conspiracy that

22 started in 2013 and ended in July 2014; is that correct?

23 A    I believe so.

24 Q    Okay.

25 A    Approximate dates.

1  Q    Did you ever have a wiretap on Ms. Lopez's phone?

2  A    No, sir.

3  Q    Okay, did you ever identify Ms. Lopez on any of the other

4  wiretaps?

5  A    I believe only Alvaro Romero's and, possibly, Miguel

6  Rodriguez's.

7  Q    You started out your explanation of her, that she's in a

8  relationship with one of the other members of the conspiracy;

9  is that correct?

10  A    Used to be, yes, sir.

11  Q    Okay, and who was that -- her person that she was in a

12  relationship with?

13  A    Alvaro Romero.

14  Q    And it's your understanding that they're no longer in a

15  relationship?

16  A    Yes, sir.

17  Q    Okay.  You mentioned that you believe that she was

18  traveling back and forth to Brownsville?

19  A    Yes, sir.

20  Q    Okay.  Was that observed activity?

21  A    It was observed on one incident where she was stopped --

22  methamphetamine.

23  Q    But you related to the Court that she was making multiple

24  trips a month?

25  A    Yes, sir.

1   Q    Okay.  But you only observed that once?

2   A    Physically.  Observed it through other means, whether it

3   be electronic surveillance, license plate readers --

4   Q    Was she ever stopped during any of those transportations?

5   A    Not that I know of.

6   Q    Okay.

7   A    It wasn't -- if it was, it wasn't by my direction or

8   anything.

9   Q    Okay, so there's no evidence that you could present to the

10  Court today that would show that there was "x" amount of drugs

11  or money in her trips to Brownsville based on evidence that was

12  seized?

13  A    Yes, sir, there -- the 7 kilograms of methamphetamine that

14  we seized from her vehicle.

15  Q    Well, I just asked you if there was anything seized from

16  any of her vehicles, and you said, "No."

17  A    I didn't hear you say that, sir.

18  Q    Okay.  During any of her trips to Brownsville, was she

19  ever stopped and she found in possession of the vehicle when

20  there was drugs or money in the car?

21  A    Yes, sir.

22  Q    Okay.  Was she arrested?

23  A    She was detained and released.

24  Q    Was she arrested?

25  A    No, sir.

1   Q    When did that happen?

2   A    I don't recall; either maybe, summer 2014, spring 2014.

3   Q    And where did that occur?

4   A    Falfurrias, Texas, at the U.S. Border Patrol checkpoint.

5   Q    And she has remained out at large since that time; is that

6   correct?

7   A    Yes, sir.

8   Q    And she still lives in basically the same area?

9   A    I believe so.  I don't know where she moved to.

10   Q    She hasn't been charged with any crimes other than this?

11   A    Correct.

12   Q    Okay, and she has not been convicted of anything that

13   you're aware of in all the time since 2014?

14   A    Since 2014, I don't believe so.

15   Q    Okay.  Has Ms. Lopez ever been in the Eastern District of

16   Texas until they brought her over here for these hearings?

17   A    Not that I know of.

18   Q    Okay.  None of the trips that you described had any

19   contact with the Eastern District of Texas?

20   A    No, sir.

21   Q    Okay.  Your allegation in the indictment is that this

22   conspiracy ended in July 2014?

23   A    Approximately.  I don't remember the exact dates.

24   Q    When you talk about these recordings and you're making

25   historical statements about who's responsible for how much

1    drugs were involved --

2    A    Yes, sir.

3    Q    -- are they talking in plain language, like, "I've got 5

4    kilograms of cocaine I would like to sell.  Will you give me

5    "x" amount of money for it?"

6    A    No, sir.

7    Q    Okay, they used code?

8    A    Yes, sir.

9    Q    Who's responsible for determining what code means?

10   A    Everybody, including myself.  I've written over 40

11   wiretaps, I've listened to several phones, I've done dozens of

12   undercover transactions.  So just based on our training and our

13   experience, we can develop what's code and what the code --

14   coded language means.

15   Q    Okay, so you come up with a code; do you then -- do you

16   have physical confirmation in every one of these circumstances

17   where there's a conversation, that what they actually said in

18   code was what actually transpired?

19          For example, they give the code for 1 kilogram of

20   cocaine; in each incidence, did you go seize or take pictures

21   of the cocaine that they're talking about?

22   A    Not on every incidence, and no.

23   Q    Okay.  Two things that you talked about with relation to

24   Ms. Lopez; one had to do with some marijuana that you believe

25   was present; another has to do with methamphetamine.  This

1   conspiracy involves powder cocaine, correct?

2   A    Yes, sir.

3   Q    And there are no seizures that relate to Ms. Lopez

4   involving powder cocaine; is that correct?

5   A    No, sir.

6   Q    Okay, you make no allegations about particular amounts of

7   money seized; are there any -- and you didn't when I asked you

8   questions about drugs or money.  Is that -- should I understand

9   that to mean that there were never any cash amounts seized from

10  Ms. Lopez?

11  A    I don't recall if there was cash seized from her.

12  Q    Okay.

13  A    I believe we did seize -- if we did seize cash, it was a

14  small amount.  Nothing -- nothing great.  I believe we seized

15  some from her residence, but maybe 4,000, $5,000.

16  Q    Was that during the period of the conspiracy or is that --

17  A    No, the search warrant.

18  Q    -- this warrant that you ran --

19  A    Yeah, just the search warrant.

20  Q    -- last Wednesday?

21  A    No currency was seized from her that I recall during the

22  period of the conspiracy.

23  Q    What residence did you search?

24  A    I can't recall.  It's -- like I said, it was ten

25  different -- or eight different locations.  I believe it was --

1   it was off Aleman (phonetic) Drive.  I can't remember the exact

2   numbers of the residence.

3   Q    How did you confirm that that was Ms. Lopez's residence?

4   A    We had an Intel analyst from Homeland Security and our

5   Intel analyst at DEA Galveston.

6             I believe they -- they found the -- I can't remember

7   how they -- how exactly they came up with that address, but

8   once we received the information that was possibly her address,

9   we had the FBI Texas Anti-Gang Unit conduct surveillance

10  several weeks prior to the actual arrest, and they visually

11  confirmed her staying there during nighttime hours from the

12  report.

13  Q    You said, "staying there."  Was there anybody else present

14  at that residence during that time period, come and go?

15  A    I don't recall.  This is one of those incidents where I

16  wasn't directly involved in the surveillance.  It was tasked

17  out to FBI.

18  Q    So this is third-party agent information that you don't

19  have personal knowledge of?

20  A    Yes, sir.

21  Q    Okay, there could have been other people that had access

22  to the residence where you believe something was seized?

23  A    Yes, sir.

24  Q    And again, all of this occurred outside the scope of the

25  conspiracy that you've alleged anyway?

1   A    Yes, sir.

2   Q    Okay.

3              **MR. MC ELROY:**  Thank you.  No further questions.

4              **THE COURT:**  Mr. Bennett?

5              **MR. BENNETT:**  May I, your Honor?

6              **THE COURT:**  Yes, you may.

7              **MR. BENNETT:**  Thank you.

8                              **CROSS EXAMINATION**

9   **BY MR. BENNETT:**

10  Q    I didn't hear you specify how you connected Mr. Worrell

11  with this conspiracy.  You said that -- that you attributed

12  some drug transactions to him, but you didn't say how.  Can you

13  explain that to us, please?

14  A    Yes, sir.  On the wiretap that we had on Mr. Rubio's

15  phone -- Jose Rubio-Villegas, we intercepted several calls

16  initially with his -- I believe his common-law wife, Maria

17  Barragan.  They referred to her as "Becky" on the wiretap.

18             During one specific incident, the 10-kilogram cocaine

19  transaction that I talked about, Mr. Rubio went to go obtain

20  the 10 kilograms of cocaine, and on his way to Mr. Barragan's

21  residence, he was pulled over.

22  Q    Okay, so I'm hearing two different things here, and I'd

23  like to understand which -- which is which.

24             You had a wiretap?

25  A    Yes, sir.

1    Q    It was on Mr. Rubio's phone?

2    A    Yes, sir.

3    Q    And on that phone, you heard Ms. Barragan's voice?

4    A    Yes, sir.

5    Q    Did you ever hear Mr. Worrell's voice?

6    A    I don't recall.  I don't believe so, no.

7    Q    Okay, did you ever, as far as you know, capture

8    Mr. Worrell's voice on any wiretap?

9    A    I don't recall it.

10   Q    Okay, so the other thing is that you're saying that the

11   drugs that Mr. Rubio was arrested -- was Mr. Rubio arrested?

12   A    Yes, sir.

13   Q    Okay, that Mr. Rubio was arrested with, the 10 kilograms,

14   you say that that was on his way to Mr. Worrell's?

15   A    Yes, sir.

16   Q    What do you base that on?

17   A    Based on the intercepted calls, like I said, with

18   Ms. Barragan, and then followed with the search warrant at the

19   residence where we saw Mr. Worrell show up.  He placed the note

20   saying, "Call me", and then a debriefing with Mr. Rubio.  He --

21   he cooperated immediately after his arrest, said he was on his

22   way to deliver it.

23   Q    Okay, so Mr. Rubio says that he was delivering the cocaine

24   to Mr. Worrell's address?

25   A    No, he didn't know his specific name; but, yes, he said he

1    was on his way to deliver it to Leeder (phonetic) Street.

2    Q    Okay, and did he actually know Mr. Worrell?

3    A    Yes, he said he -- he had completed five to ten

4    transactions ranging, I believe, 5 to 10 kilograms of cocaine

5    each transaction.

6    Q    Okay, so how much controlled substances are you

7    attributing to Mr. Worrell in this conspiracy?

8    A    Just, not counting that debriefing, only from the wiretap

9    of the 14 kilograms of cocaine.

10   Q    Okay, so what was the other 4 kilograms?

11   A    I don't recall the incident.  There's, like I said, so

12   many.

13   Q    Did Mr. Worrell -- and it was so long ago, right?

14   A    Yeah, it was very long.

15   Q    So what's been happening for the last four years on this

16   conspiracy?

17   A    Just due to administrative reasons, the AUSA assigned to

18   the case had left, became a judge; it got reassigned several

19   other times.  And during that process, I and other

20   investigators ended up working other investigations with

21   several other wiretaps, and this case kind of got pushed

22   further back until the AUSA assigned to it came on board and

23   we -- we put together the indictment packages.

24   Q    Okay, but you were on the case in 2013, 2014?

25   A    Yes, sir, I was.

1  Q    And you've been continually employed in the DEA Galveston

2  field office --

3  A    Yes, sir.

4  Q    -- for that time?

5        Okay, so let's talk about Mr. Worrell during that

6  time.  You know that he got in some trouble with the law,

7  right?  After 2014, he got in some trouble with the law?

8  A    I believe that I saw something on the criminal history.

9  Q    Okay, but you're not familiar with it personally?

10  A    I don't know the exact details, no, sir.  No, just --

11  Q    So if I were to -- if I were to ask you to confirm that he

12  was out on bond on a Federal -- or a State felony case and that

13  he faithfully appeared, including to serve his sentence in that

14  case, you wouldn't be able to confirm or refute that, right?

15  A    No, sir.  I only know this based off his criminal history.

16  Q    Fair enough.  There were no controlled buys and no

17  controlled deliveries involving Mr. Worrell?

18  A    Correct, none.

19  Q    There was no wiretap on his phone or on Maria Barragan's

20  phone?

21  A    No, sir, no wiretaps.

22  Q    Did Mr. Worrell show any other reaction to the seizure of

23  the 10 kilograms other than leaving a note on the door of

24  Mister --

25  A    Rubio?

1  Q    -- Rubio?

2  A    What do you mean by "reaction"?

3  Q    Was there anything else conspicuous about -- was there

4  anything conspicuous about how he reacted after the 10

5  kilograms was seized?

6         You know, sometimes we'll see that the person who is

7  owed the drugs or who's responsible for the drugs blows up the

8  phones, right, when drugs are seized?

9  A    Yes, sir.

10  Q    We see it all the time.

11        So was there anything of that nature in this case?

12  A    I don't recall.  I'd have to go back and look at reports.

13  Q    Okay, but nothing that you prepared yourself to testify

14  about today?

15  A    No, sir.

16         **MR. BENNETT:**  I'll pass the witness, your Honor.

17         **THE COURT:**  Any Redirect?

18         **MR. RAPP:**  Just briefly, your Honor.

19         **THE COURT:**  Very briefly.

20         **MR. RAPP:**  Thank you.

21                    **REDIRECT EXAMINATION**

22  **BY MR. RAPP:**

23  Q    Just a few things I want to cover --

24  A    Yes, sir.

25  Q    -- with Ms. Lopez.  Defense Counsel you -- asked you about

1   the search warrant at her house; do you remember that?

2   A    Yes, sir.

3   Q    How much marijuana was seized during the search warrant?

4   A    Approximately 108 pounds.

5   Q    A hundred and eight pounds?  And this was a week ago?

6   A    Yes, sir, last Wednesday.

7   Q    Okay, let's talk about cocaine and ties to the Eastern

8   District of Texas?

9   A    Yes, sir.

10  Q    Did the investigation establish that?

11  A    Yes, sir.

12  Q    And tell us about that.

13  A    There were several incidents, but I can -- I recall one

14  specifically on Alvaro Romero's first wiretap.  I believe an

15  individual named Andre Goins (phonetic) arrived to purchase

16  half a kilogram of cocaine.  He traveled from Louisiana to

17  Alvaro Romero's residence.

18        He obtained the half-kilogram.  We followed him, and

19  he was stopped in Beaumont, Texas, and the half-kilogram of

20  cocaine was seized.

21  Q    Okay, let me ask you, just broadly, we're attributing

22  these different weights to different individuals.  What,

23  broadly, is the drug amount involved in the whole conspiracy,

24  if you know?

25  A    Yeah, I don't know, sir.

1   Q    Okay, but we're having 10 kilograms at a time of cocaine,

2   7 kilograms of actual methamphetamine; those are the amounts

3   per transaction; is that fair to say?

4   A    Yes, sir.  It was over a hundred kilograms of cocaine.  I

5   just don't -- I can't give you not even a ballpark figure.  I'm

6   not -- I'm not prepared for that.

7   Q    Fair enough.

8            **MR. RAPP:**  I have no further questions, your Honor.

9            **THE COURT:**  Mr. Silverman, any questions based upon

10  his questions?

11           **MR. SILVERMAN:**  Yes, sir.  Can I just stand here?

12           **THE COURT:**  Why don't we use the podium?

13           **MR. SILVERMAN:**  All right.  I'll go back up.

14           **THE COURT:**  I hate to do it, Mr. Silverman --

15           **MR. SILVERMAN:**  Yes, sir.

16           **THE COURT:**  -- but we need to make sure we get a

17  record, okay?

18           **MR. SILVERMAN:**  Okay.

19                    **RECROSS EXAMINATION**

20  **BY MR. SILVERMAN:**

21  Q    So the nexus to Beaumont is the seizure of a half-kilo

22  from someone not charged in the indictment?

23  A    No, I said that's one incident, sir.

24  Q    Are there other Eastern District incidents?

25  A    Yes, sir.

1  Q    Like what?

2  A    Like I said, I can't recall.  The case was four years ago,

3  and there's a lot of -- lot of information.

4  Q    Did you bring --

5  A    But that's when I --

6  Q    Did you bring any report with you today?

7  A    No, sir, I don't bring reports with me when I testify.

8  Q    But you wrote some?

9  A    Yes, I wrote a lot of reports in the investigation.

10  Q    And reviewed others?

11  A    Yes, sir.

12  Q    Okay, and you're in the Southern District of Texas?

13  A    Yes, sir.

14  Q    And so Mr. Elizondo is in the -- lives in the Southern

15  District of Texas, right?

16  A    Yes, sir.

17  Q    All right.  And certainly you have no evidence connecting

18  Mr. Elizondo to Mr. Goins right?

19  A    Not directly.

20  Q    Well, do you have some indirect evidence?

21  A    No, sir.

22  Q    Okay, and so did you -- when the AUSA that had the case

23  became a judge, was that an AUSA in the Eastern District?

24  A    Yes, sir.

25  Q    So did you ever present this case to the Southern

1  District?

2  A    No, sir.

3  Q    Did you --

4           MR. RAPP:  Objection; this is beyond the scope.

5           THE COURT:  I'm going to go ahead and let him go into

6  it.

7  BY MR. SILVERMAN:

8  Q    Did you ever present it to any other Federal District?

9  A    No, sir.

10 Q    What date was the last act done in furtherance of this

11 conspiracy by any conspirator?

12 A    I don't recall, sir.  It's four years ago.

13          MR. SILVERMAN:  Pass the witness.

14          THE COURT:  Okay, Mr. Wright, do you have any

15 questions --

16          MR. WRIGHT:  No, your Honor.

17          THE COURT:  -- based upon the questions?

18          Okay, Mr. McElroy?

19          MR. MC ELROY:  No, your Honor.

20          THE COURT:  And Mr. Bennett?

21          MR. BENNETT:  No, your Honor.

22          THE COURT:  Okay, may this witness step down?

23          MR. RAPP:  Yes, your Honor.

24          THE COURT:  Thank you, sir.

25          THE WITNESS:  Thank you, sir.

1          **THE COURT:**  Government rest, Mr. Rapp?

2          **MR. RAPP:**  The Government does rest.

3          **THE COURT:**  Okay.  Mister -- Mr. Silverman, do you

4    have any -- any witnesses you wish the Court to listen to?

5          **MR. SILVERMAN:**  Your Honor, I had the -- I proffered

6    witnesses to -- to the probation officer, and I brought some

7    exhibits that I wanted to proffer into evidence.  I forgot to -

8    -

9          **THE COURT:**  Go ahead and use the podium over there,

10   Mr. Silverman.

11         **MR. SILVERMAN:**  Okay.

12         **THE COURT:**  I'm (indiscernible) about that.  And,

13   gentlemen, so that you know that -- that I usually -- I don't

14   mind taking a proffer, but I like to hear -- if it's basically

15   just going to be a third-party custodian, I like for them to

16   testify so that I can -- under oath, if that's a possibility.

17         **MR. SILVERMAN:**  All right.

18         **THE COURT:**  But if you insist on proffering, I'll

19   take --

20         **MR. SILVERMAN:**  No.

21         **THE COURT:**  -- it under consideration.

22         **MR. SILVERMAN:**  No.  I will call my witness.

23         **THE COURT:**  Okay, that will be fine.

24         **MR. SILVERMAN:**  And that would be the mother of

25   Arturo Elizondo.

1              Yes, ma'am.

2              **THE COURT:**  If you'll come on up here, ma'am, I'll

3    need to swear you in.

4              **THE CLERK:**  We're going to need a translator.

5              **MR. SPEAKER:**  I think you're going to need a

6    translator.

7              **MR. SILVERMAN:**  Oh, okay.

8              **THE COURT:**  That's okay.  Right there.  What's your

9    name, ma'am?

10             **THE WITNESS:**  Claudia Elizondo.

11             **THE COURT:**  Ms. Elizondo, do you swear -- raise your

12   right hand for me, okay?

13        **CLAUDIA ELIZONDO, DEFENDANT ELIZONDO'S WITNESS, SWORN**

14             **THE COURT:**  Thank you.  If you'll have a seat,

15   please, ma'am.

16             **MR. SILVERMAN:**  Judge, does the Court have an

17   interpreter present?

18             **THE COURT:**  We don't have one -- well, we don't have

19   one available right now.  I could have got you one if I'd have

20   known.  It's got to be a court --

21             Ms. Elizondo, do you -- I want to make sure that you

22   can understand Mr. Silverman and you can understand me.  Can

23   you understand us okay?

24             **THE WITNESS:**  I don't know.  I think I need help.

25             **THE COURT:**  Okay.

1           **MR. SILVERMAN:**  I'm sorry.

2           **THE COURT:**  That's okay.

3           **MS. SPEAKER:**  She's able to understand simple

4   sentences.

5           **THE COURT:**  Why don't we -- why don't we do this; why

6   don't we -- I'll go ahead and take up -- we'll see if Ms. White

7   can get somebody on the line at the last minute.  If not, I'll

8   take a proffer testimony.

9           **MR. SILVERMAN:**  I'm sorry.

10          **THE COURT:**  That's okay.  Don't worry about that.

11          Ma'am, why don't you just have a seat and we'll see

12   if we can get an interpreter on the line, okay?

13          **THE WITNESS:**  Okay.  Thank you.

14          **THE COURT:**  Thank you, ma'am.

15       **(Witness steps down)**

16          **THE COURT:**  Why don't we go ahead and go to

17   Mr. Wright?

18          **MR. WRIGHT:**  Thelma Orozco --

19          **THE COURT:**  Ms. Orozco?

20          **MR. WRIGHT:**  -- his wife.

21          **THE COURT:**  Okay.  Let me go ahead and swear you in,

22   ma'am, okay?

23       //

24       //

25       //

1          **THELMA OROZCO, DEFENDANT AVILES' WITNESS, SWORN**

2                         **DIRECT EXAMINATION**

3     **BY MR. WRIGHT:**

4     Q    State your name, please.

5     A    Thelma Orozco.

6     Q    And how old are you?

7            **THE COURT:**  Can you spell your name for me, please,

8     ma'am?

9            **THE WITNESS:**  T-H-E-L-M-A.

10           **THE COURT:**  T-H-E --

11           **THE WITNESS:**  -- L-M-A.

12           **THE COURT:**  -- L-M-A.  Okay, thank you, ma'am.  And

13    spell your last name?

14           **THE WITNESS:**  Orozco; O-R-O-Z-C-O.

15           **HE COURT:**  Thank you so much.

16    **BY MR. WRIGHT:**

17    Q    And your age?

18    A    Thirty.

19    Q    And where do you live?

20    A    In Channelview.

21    Q    And how long have you lived in Channelview?

22    A    I've been there for about three years.

23    Q    At the same residence?

24    A    Correct.

25    Q    Are you employed?

1   A    Yes, sir.

2   Q    And where are you employed?

3   A    Leland Baking Company (phonetic).

4   Q    And how long have you been employed there?

5   A    I've been there seven years.

6   Q    And what is your job title?

7   A    Human resource associate.

8   Q    Okay, do you have a family, other than your husband?

9   A    Yes, sir, I have a son.

10   Q    And how old is he?

11   A    He's 6 years old.

12   Q    Does he reside with you?

13   A    Yes, sir.

14   Q    And it's my understanding that you're also expecting a

15   child?

16   A    Correct, sir.

17   Q    And that's your husband's child; is that correct?

18   A    Yes, sir.

19   Q    And that child is due in June of this year?

20   A    Yes, sir.

21   Q    Give us a little background as to your husband, his work

22   history.  What -- does he work currently?

23   A    Yes, he does, sir.

24   Q    And where does he work?

25   A    He works at Matrix (phonetic).

Orozco - Direct / By Mr. Wright                    41

1   Q    And how long has he been at that job?

2   A    He's probably been there about nine months; nine or ten

3   months, give or take, but he's been employed at other plants.

4   Just when the contract's end, he'll move to another plant,

5   another refinery plant.

6   Q    Okay, and is that a 40-hour-a-week job or --

7   A    Yes, it's 50.

8   Q    Okay, and he works that job every day?

9   A    Yes, sir.

10  Q    Okay, do you need his income to help pay the bills at

11  home?

12  A    Yes.

13  Q    Is it critical -- that his income is critical to your

14  support and the family's support?

15  A    Yes, sir.

16  Q    Have you ever been arrested before?

17  A    No, sir.

18  Q    Okay, and you've been interviewed by the probation

19  department in this case?

20  A    Yes.

21  Q    And it's your understanding that they determined you to be

22  a suitable third-party custodian?

23  A    Yes, sir, I got confirmation today.

24  Q    Okay, and do you kind of understand what's expected of a

25  third-party custodian?

1  A    More so, yes, sir.

2  Q    That you're partly the eyes and ears for the Court and

3  that you're telling the Court that you will make sure that your

4  husband gets to court?

5  A    Yes, sir.

6  Q    And you will drive him to court, if necessary?

7  A    Yes, sir.

8  Q    And you will also assure the Court that he complies with

9  any conditions that the Court may set?

10 A    Yes, sir, I will.

11 Q    Which would mean that you would have to contact probation

12 or the Court if he violated any of the conditions?

13 A    Yes, sir.

14 Q    And if the Court saw fit, you may possibly have to sign a

15 surety bond that would obligate you if your husband failed to

16 appear to that sum of money?

17 A    Yes, sir.

18 Q    And you're willing to act as a third-party custodian?

19 A    I sure am, sir.

20 Q    Do you think your husband would appear for court?

21 A    I definitely do.

22 Q    Okay.

23        **MR. WRIGHT:**  I pass the witness, your Honor.

24        **THE COURT:**  Okay, any questions, Mr. Rapp?

25 //

**CROSS EXAMINATION**

**BY MR. RAPP:**

Q    About a week ago, was a warrant executed at your home?

A    Yes, sir.

Q    Okay, and you have no reason to disagree with me that

firearms were recovered from that home, correct?

A    Correct.

Q    Okay, and Mr. Aviles is a convicted felon; is that

correct?

A    From what I'm hearing at the court -- from what they're

saying.

Q    Okay, you understand you're not allowed to have --

convicted felons aren't allowed to have guns; you understand

that, right?

A    Yes.  Those firearms are under my name.  I wasn't aware

that -- if he wasn't supposed to be --

Q    You understand this whole thing is about rules, right?

A    Most -- most things are, yes, sir.

Q    Fair enough.  And should you be a third-party custodian,

you have some rules about what your -- what he's allowed, what

he's not allowed to do; you understand that?

A    Yes, sir.

Q    When he's supposed to go to court, correct?

A    Yes, sir.

Q    When he's not supposed to go to court?

1   A     Yes, sir.

2   Q     Okay.

3              MR. RAPP:  I have no further questions.

4              THE COURT:  Okay, any follow-up?

5              MR. WRIGHT:  No, your Honor.

6              THE COURT:  We have an interpreter?  Okay.

7              Mr. Wright, do you --

8              MR. WRIGHT:  I have no further questions, your Honor.

9              THE COURT:  Okay, thank you.

10             MR. WRIGHT:  And no further witnesses.

11             THE COURT:  Okay, thank you.  You rest?

12             MR. WRIGHT:  Yes, sir.

13             THE COURT:  Okay, I think we have an interpreter on

14  the line.

15             Thank you, ma'am, you can sit down.  Thank you.

16             THE WITNESS:  Thank you.

17         **(Witness steps down)**

18             MR. WRIGHT:  Thank you, your Honor.

19             THE COURT:  You're welcome.

20         **(Discussion between Attorney and Witness)**

21             THE COURT:  Norm, she'll have to sit at the table so

22  she can use -- Mr. Wright, if you and your client could move

23  over to the side over there so I could sit -- sit her there.

24             MR. SILVERMAN:  Go ahead and have a seat right there.

25             THE COURT:  Hang on just a second, hang on just a

1    second.  Let's do this.  Sit her at the end of the prosecution

2    table right there.

3              **MR. SILVERMAN:**  Okay, come sit --

4              **THE COURT:**  Thank you.

5              **MR. SILVERMAN:**  -- right here.

6              **THE COURT:**  Oh, that's right.  That's right.  I'm

7    sorry, she can't get to the phone.

8              **MR. SILVERMAN:**  We can move the microphone down --

9              **THE COURT:**  No, let's do -- let's do this.  Let's --

10   I'll ask everyone to -- everyone and their clients to step back

11   away from the table, so that way that --

12             Is it okay, gentlemen?  Okay.

13             If you'll go ahead and step over -- step over there,

14   please, sir.

15             **MR. SILVERMAN:**  Okay.

16             **THE CLERK:**  Wait, wait, wait.  I have to get him on

17   the line.

18             **THE COURT:**  Have to get him on the line.  Hang on a

19   second.

20             And, Kevin, make sure she can get to the phone right

21   there.

22       **(Pause)**

23             **THE INTERPRETER:**  Okay, the interpreter is ready.

24             **MR. SILVERMAN:**  Okay, all right.

25             **THE COURT:**  Okay, we're back -- we're back on the

1    record.  And this is the detention hearing regarding Mister --

2           **MR. SILVERMAN:**  Arturo Elizondo.

3           **THE COURT:**  -- Arturo Elizondo.  And we have a

4    witness, and we have Mr. Carbajosa on the line again as an

5    interpreter.

6           Mr. Carbajosa, you're currently under oath, and I

7    administered that oath earlier in the day.

8           So we'll proceed.  Go ahead, Counsel.

9           **MR. SILVERMAN:**  Thank you, your Honor.

10   **CLAUDIA ELIZONDO, DEFENDANT ELIZONDO'S WITNESS**

11                     **PREVIOUSLY SWORN**

12                **(Testimony through Translation)**

13                     **DIRECT EXAMINATION**

14   **BY MR. SILVERMAN:**

15   Q    Ms. Elizondo, would you please state your name for the

16   record?

17   A    Claudia Elizondo.

18   Q    All right.  I'm going to ask you a couple of questions.

19   If you don't understand me or if you don't understand the

20   interpreter, just stop and tell us, okay?

21          **THE COURT:**  Norm, let her answer.  Because she --

22          **THE INTERPRETER:**  Yes, very well.

23          **THE COURT:**  Okay, let the interpreter come back to me

24   with it on the speaker.  Okay, go ahead.

25          **MR. SILVERMAN:**  Okay.

1          **THE COURT:**  Just slow it down for me.

2          **MR. SILVERMAN:**  Yes, sir.

3   **BY MR. SILVERMAN:**

4   Q    Is your son Arturo Elizondo?

5   A    Yes, sir.

6   Q    And have you known him his whole life?

7   A    Yes, sir.

8   Q    Do you know that he has three daughters?

9   A    Yes, sir.

10  Q    I'm going to show you four pictures which are numbered 11

11  to 14 of Mr. Elizondo's -- Arturo Elizondo's family, okay?

12  A    Yes, sir.  Those are --

13  Q    All right, are those your grandchildren?

14  A    Yes, they are my grandchildren.  It's my son, my daughter,

15  and my daughter-in-law.

16         **MR. SILVERMAN:**  All right.  We offer 11 through 14.

17         **THE COURT:**  They'll be admitted as marked with no

18  objection.

19         **(Defendant Elizondo's Exhibits Numbers 11 through 14 were**

20  **received in evidence)**

21  **BY MR. SILVERMAN:**

22  Q    Where -- now your son, before he was arrested, Arturo

23  Elizondo, lived with his wife and children in Houston; is that

24  right?

25  A    Yes, sir.

1  Q     Do you also live in Houston?

2  A     Yes, sir.

3  Q     What -- what is your address?

4  A     My address is 11511 Willowood (phonetic), Texas, Houston,

5  77022.

6  Q     How long have you lived -- how long have you lived --

7  A     I've lived there, like, about 19 years -- 17 years.

8  Q     With whom do you live at that house?

9  A     I live with my husband.

10 Q     If the Judge saw fit to let Arturo Elizondo out on bond,

11 if he would live with you and your spouse, would you permit him

12 to live at your house?

13 A     Yes, sir, of course.  Of course.

14 Q     If the Judge required that you serve as what's called a

15 third-party custodian -- first of all, do you understand what

16 that means?

17 A     Yes, I do know, sir.

18 Q     All right.  And my wife, Daphne (phonetic), who's also a

19 lawyer, explained all of that to you; is that right?

20 A     Yes.

21 Q     And you --

22 A     Yes, I understand.

23 Q     All right.  And you understand that the Court would be

24 trusting you to make sure that Arturo Elizondo attends all of

25 his court dates, right?

1   A    Yes, sir.

2   Q    And follows the conditions of bond?

3   A    Yes, sir.

4   Q    And generally follows the law?

5   A    Yes, sir.

6   Q    Would you be willing to serve in that capacity?

7   A    Yes, sir.

8   Q    Now, Mr. Elizondo -- Arturo Elizondo was working and had

9   his own business at the time of his arrest; are you familiar

10  with that?

11  A    Yes, sir.

12  Q    And you know that he had a flatbed truck -- and I'm going

13  to ask you to look at some pictures and see if you recognize

14  this vehicle.

15  A    Yes, sir; yes, sir.

16  Q    I'm showing you pictures 1 through 10.

17  A    Okay.

18  Q    Take a look at these.

19  A    I'm looking at them.  These are the ones.

20  Q    And is that Mr. Arturo Elizondo's truck?

21  A    Yes, sir, that's it.

22  Q    All right.  Now, that truck was seized by the police when

23  they arrested Arturo Elizondo; did you know that?

24  A    Yes, sir.

25  Q    So one of the conditions the Judge would require of Arturo

1   Elizondo is that he get a job and --

2   A    Yes, sir.

3   Q    Would you help the Court by requiring that Arturo Elizondo

4   work?

5   A    Yes, sir.

6   Q    All right.  Now, the hardest thing, I think, for a mother

7   is, if Mr. Arturo Elizondo does not follow a condition of the

8   Court, it's the job of the third-party custodian to call the

9   authorities and tell them that he's not following the rules.

10          Would you do that?

11  A    Yes, sir.

12  Q    All right.

13          **MR. SILVERMAN:**  Pass the witness.

14          **THE COURT:**  Any questions, Mr. Rapp?

15          **MR. RAPP:**  Yes, sir.

16          **MR. SILVERMAN:**  Oh, I offer my work truck pictures,

17  one through ten.

18          **THE COURT:**  Any objection to the other pictures?

19          **MR. SILVERMAN:**  I'm sorry.

20          **MR. RAPP:**  No, Judge.

21          **THE COURT:**  And what numbers are those?

22          **MR. SILVERMAN:**  One through ten.

23          **THE COURT:**  I'm sorry?

24          **MR. SILVERMAN:**  One through ten, your Honor.

25  //

1          **THE COURT:**  They'll be admitted as marked.

2          **(Defendant Elizondo's Exhibits Numbers 1 through 10 were**

3  **received in evidence)**

4          **MR. RAPP:**  Can I get the screen?

5          **THE WITNESS:**  Very well.

6          **THE COURT:**  Mr. Rapp, let's go ahead and proceed.

7  You may show her the pictures if you -- if you want her to look

8  at them, we -- something's wrong with the light.  We can't get

9  the screen to come on.  So go ahead.

10         And make sure and take your time because she's using

11 a translator, okay?

12         **MR. RAPP:**  Understood.

13         **THE WITNESS:**  Very well.

14                         **CROSS EXAMINATION**

15 BY MR. RAPP:

16 Q    Ma'am, who all lives in the house he was -- your son was

17 living in a week ago?

18 A    He lives there, his daughters, and his wife do.

19 Q    Okay, do they still live there?

20 A    Yes, they still live there.

21 Q    Okay, and you're aware the police came to his house and

22 arrested him about a week ago; you know that, right?

23 A    Yes, yes.  Yes, sir.

24 Q    Okay, and while his children were living there, police

25 recovered a half-ounce of cocaine in his house; did you know

 1  that?

 2          **THE INTERPRETER:**  Interpreter didn't hear the

 3  amounts, I'm sorry?

 4  **BY MR. RAPP:**

 5  Q    A half an ounce of cocaine was recovered in his house

 6  while his children were living there; were you aware of that?

 7  A    Yes, sir.

 8  Q    And a half-ounce of methamphetamine was also recovered

 9  where his children live; were you aware of that?

10  A    Yes, they told me.

11  Q    And a firearm, a pistol, was also recovered where his

12  children were living; were you aware of that?

13  A    Yes, sir.

14  Q    Okay, and you know that he's a convicted felon, correct?

15  A    Yes, sir.

16  Q    Okay, he's not allowed to have guns, right?

17  A    No, that's not allowed.  I do know that, sir.

18  Q    Okay.  In addition, marijuana was in the house, as well,

19  where his children were, a week ago; you know that, right?

20  A    Yes, sir.

21  Q    Okay.

22          **MR. RAPP:**  I have no further questions, your Honor.

23          **THE COURT:**  Mr. Silverman, do you have anything to

24  follow up?

25          **MR. SILVERMAN:**  No, sir.

1          **THE COURT:**  Okay, thank you -- ma'am, thank you so

2   much.

3          Jorge, thank you for being with us on short notice.

4   I really appreciate that.

5          **THE INTERPRETER:**  You're very welcome, your Honor.

6   Thank you.

7          **THE COURT:**  Thank you.

8          **THE INTERPRETER:**  And thank you.

9          **THE COURT:**  We're going to -- we're going to take

10   just a very short recess while -- a restroom recess so that

11   everybody can get situated.  I'll be right back out in about a

12   minute.

13          **THE MARSHAL:**  All rise.

14     **(Recess was taken from 3:58 to 4:03 p.m.)**

15          **THE COURT:**  Okay, we're back on the record in the

16   detention hearing.

17          Mr. McElroy, do you have any witnesses that you wish

18   to call in this matter?

19          **MR. MC ELROY:**  Yes, your Honor.

20          Ms. Lopez would call Maria Zavary to the stand.

21          **THE COURT:**  Ms. Zavary?

22          Ms. Zavary, let me swear you in, okay?

23     //

24     //

25     //

1    **MARIA ZAVARY, DEFENDANT LOPEZ'S WITNESS, SWORN**

2        **THE COURT:**  Thank you, now.  Make sure and speak

3    clearly in the microphone for me.

4                    **DIRECT EXAMINATION**

5    **BY MR. MC ELROY:**

6    Q    Ma'am, could you state your name for the record?

7    A    Maria Zavary.

8    Q    And where do you live?

9        **THE COURT:**  Ms. Zavary, how do you -- how do you

10   spell your last name?

11           **THE WITNESS:**  Z-A-V-A-R-Y.

12           **THE COURT:**  -- A-V-A-R-Y?

13           **THE WITNESS:**  Correct.

14           **THE COURT:**  Okay, and the first name is Maria?

15           **THE WITNESS:**  Maria.

16           **THE COURT:**  Thank you.

17           **THE WITNESS:**  Uh-huh.

18   A    I live at 16419 Pinon Vista Drive, Houston, Texas, 77095.

19   Q    How long have you lived in the Houston area?

20   A    Sixteen years.

21   Q    Okay.  Do you have a job?

22   A    Yes.

23   Q    And where do you work?

24   A    As a dental assistant at a dental office.

25   Q    Okay, how long have you done that?

1  A    It's already been three years.

2  Q    Okay.  Do you have a car?

3  A    Correct.

4  Q    And you used that car to get here today?

5  A    Yes.

6  Q    Okay.  Have you ever been convicted of any crime other

7  than like a traffic offense?

8  A    No, sir.

9  Q    Okay.  And what is your relationship to Cynthia Lopez?

10 A    Sister.

11 Q    Are you her younger sister or older sister?

12 A    One year older.

13 Q    Okay, so you've known here all her life?

14 A    Correct.

15 Q    All right.  Who lives at your residence currently?

16 A    My husband and four kids.

17 Q    Okay, does anybody at your residence have any firearms or

18 guns?

19 A    No.

20 Q    Okay.  Does anybody have any criminal history that lives

21 there?

22 A    No.

23 Q    Do you know if Cynthia has a job?

24 A    Yes.

25 Q    And what kind of job is it, as best you know?

1    A    It's an electric company called Stream (phonetic).

2    Q    And she works out of her home to do that job, correct?

3    A    Correct, yes.

4    Q    So if the Judge ordered her to have a job, but to live

5    with you, she could actually do that job from your house?

6    A    Yes.

7    Q    Is that correct?

8    A    Uh-huh.

9    Q    Okay, as far as you know, she still has that job, correct?

10   A    Yes.

11   Q    Other than yourself and your family, does Cynthia have any

12   family in the Houston area?

13   A    Yes, my mom -- sorry, my mom lives with me, too.  She just

14   moved in.

15   Q    Okay, and what other relatives that, you know --

16   A    I have another sister and two other brothers.

17   Q    Okay, does Cynthia have any children that live in the

18   area?

19   A    Yes, a son.

20   Q    Okay, do you believe that they, along with yourself, will

21   support her if the Judge releases her?

22   A    Yes.

23   Q    Do you believe that Cynthia would be a serious flight risk

24   if she were released by the Judge?

25   A    No.

1    Q    Why not?

2    A    She's a good mom, a great grandma, she's just good, a good

3    person.

4    Q    Okay, do you believe that she would present any danger to

5    the community if she were released?  And I mean more than

6    simply a physical danger, but like that she would violate the

7    law or do something else.

8    A    None at all.

9    Q    Okay, do you believe she would try to in any way put you

10   at risk if you were her third-party custodian?

11   A    No.

12   Q    Okay.  Did you and I talk about the responsibilities of

13   third-party custodian?

14   A    Yes.  Yes, sir.

15   Q    Did you also speak with somebody with the Pretrial

16   Services Offices; a probation officer?  You don't need to know

17   their name, but you did speak with someone?

18   A    Yes.

19   Q    Okay, I think it was Mr. Goforth, though, correct?

20   A    Yes, that was Mark Goforth, I think.

21   Q    Okay.  And you, after having those conversations,

22   understand the role of a third-party custodian?

23   A    Correct.

24   Q    Are you willing to serve as Cynthia's third-party

25   custodian under the direction of this Court?

1   A    Yes.

2   Q    You promise to comply with all the instructions that the

3   Court give you as a third-party custodian?

4   A    Yes.

5   Q    That would include making sure that she shows up when the

6   Court has ordered her to do so; you understand?

7   A    Yes.

8   Q    Also to make sure that she obeys the terms and conditions

9   of whatever her release is?

10  A    Yes.

11  Q    If she violates any of those terms and conditions, it

12  would be your responsibility to make sure that the proper

13  authorities are notified; you understand that?

14  A    Correct, yes.

15  Q    Could you still do that, even though she's your younger

16  sister?

17  A    Yes.

18  Q    Okay.  You understand that, if for any reason, you neglect

19  those duties of the third-party custodian, there could be

20  penalties that are attributable to you?

21  A    That's -- yes, that's fine.

22  Q    And you're willing to do that?

23  A    Yes, correct.

24  Q    Okay, if the Judge requires that you sign a bond in this

25  case, are you willing to do that as well?

1   A    Yes.

2   Q    Thank you, Ms. Zavary.

3              **MR. MC ELROY:**  I have no further questions.

4              **THE COURT:**  Mr. Rapp?

5                       **CROSS EXAMINATION**

6   **BY MR. RAPP:**

7   Q    Ma'am, as of a week ago, who all was living in your

8   sister, Cynthia's, home?

9   A    It was her and a boyfriend.

10  Q    Okay, is there a baby around as well?

11  A    She helps --

12  Q    I'm sorry?

13  A    She helps with the baby -- her grandbaby.

14  Q    Her grandbaby, okay.

15  A    Yes.

16  Q    So, it was around the home?

17  A    Yeah, she's -- the baby doesn't live there, she just

18  babysits.

19  Q    Okay, is there a room the baby would stay in?

20  A    Yes.

21  Q    Okay, and about a week ago the police did a search warrant

22  at that home?

23  A    Uh-huh.

24  Q    You're aware of that, correct?

25  A    What I heard, yes.

Zavary - Cross / By Mr. Rapp                              60

1  Q    Okay, and they recovered more than a hundred pounds of

2  marijuana in the center room of the house; you know that,

3  correct?

4  A    I didn't know that.

5  Q    Okay.  They also recovered a pistol in the room where the

6  baby stays; are you aware of that?

7  A    No.

8  Q    Okay.  Well, you're presenting yourself as --

9  A    I just found out now about the --

10 Q    Okay.

11 A    -- pounds of marijuana.

12 Q    So you didn't know any of that?

13 A    No.

14 Q    But as a third-party custodian, you got to kind of know

15 what she does; you understand that?

16 A    Yes, that's fine.

17 Q    And you'd agree with me that, as of a week ago, you didn't

18 know about the marijuana, you didn't know about the guns,

19 right -- the gun?

20        MR. MC ELROY:  Objection; argumentative, your Honor.

21 She already said she didn't know.

22        THE COURT:  Sustained.  Go ahead and move along.

23        MR. RAPP:  Okay.

24        THE COURT:  She said she didn't know.

25 //

1    **BY MR. RAPP:**

2    Q    I guess my question for you --

3    A    Uh-huh.

4    Q    -- is if you didn't know that was going on a week ago, how

5    can you assure the Court you'll prevent her from committing

6    other crimes going forward?

7    A    Because I know her.

8    Q    Okay.  Thank you.

9         **MR. RAPP:**  I have no further questions.

10        **THE COURT:**  Mr. McElroy?

11        **MR. MC ELROY:**  Nothing further.  And the Defense of

12   Ms. Lopez, we rest.

13        **THE COURT:**  Okay, thank you, ma'am.  You may step

14   down.

15   **(Witness steps down)**

16        **THE COURT:**  Mr. Bennett?

17        **MR. BENNETT:**  Thank you, your Honor.

18        Your Honor, before I call my witness, may I proffer

19   something from the Harris County District Clerk's records?

20        **THE COURT:**  Yes, you may.

21        **MR. BENNETT:**  I didn't bring a printout of it, but if

22   it's contested, I can certainly provide a printout of it.

23        And that is, that the last time that Mr. Worrell was

24   arrested, which is reflected in the Pretrial Report as the

25   attempted felon in possession case, between 2015 and 2017, on

1    Page 6, that he made bail on that case and faithfully appeared

2    in court every time as required and, in fact, was allowed to

3    continue on bail after his guilty plea and to self-report to

4    the jail, which he did in the end there in July of 2017.

5           It's just -- it's not reflected in the Pretrial

6    Services Report, but I think that's an important aspect of

7    Mr. Worrell's criminal history to look at.

8           **THE COURT:**  I'll accept that proffer.  Go ahead.

9           **MR. BENNETT:**  Thank you, your Honor.

10          **THE COURT:**  You're welcome.

11          **MR. BENNETT:**  I would call Gloria Worrell, please,

12   your Honor.

13          **THE COURT:**  Ms. Worrell?

14          Ms. Worrell, let me go ahead and place you under

15   oath, okay?  Do you -- raise your right hand for me.

16      **GLORIA WORRELL, DEFENDANT WORRELL'S WITNESS, SWORN**

17          **THE COURT:**  Thank you, ma'am, if you'll have a seat.

18   And make sure and speak into the microphone for me, okay?

19          **THE WITNESS:**  Yes, sir.

20                        **DIRECT EXAMINATION**

21   **BY MR. BENNETT:**

22   Q    Ms. Worrell, would you introduce yourself to Judge Giblin,

23   please?

24   A    I'm Gloria Worrell.

25   Q    What's your relationship to Mr. Worrell, Sid Worrell,

1   who's sitting at the table here?

2   A    That's my son.

3   Q    So you've known him his whole life?

4   A    Yes, sir.

5   Q    All right.  Do you live here -- do you live near him?

6   A    Yes, sir.

7   Q    Where do you live?

8   A    I live at 11034 West Bellfort, Houston, Texas.

9   Q    And he -- where does he live?

10  A    He lives -- sometimes he's at the house with me and

11  sometimes he's with his wife.

12  Q    Okay, and if Judge Giblin allows him to be released on

13  conditions, that is, on bail, can he live with you?

14  A    Yes, sir.

15  Q    And if he's living with you, do you feel comfortable

16  promising Judge Giblin that you'll make sure that Sid walks the

17  straight and narrow while he's living with you and that he

18  comes to court as he's supposed to and he stays out of trouble?

19  A    Yes, sir.

20  Q    Now, I know that Mr. Rapp is going to ask you this

21  question, so let me ask you this question before he can get to

22  it, which is, how do you know that, since he's been getting in

23  trouble when he's not living with you?

24  A    Well, I know Sidney.  He's my child and he loves his

25  mother dearly.  And when I talk to him, most of the time, he

1  listens.

2  Q    Thank you.  Are you willing to -- if he gets in trouble

3  while -- or if you see him getting into trouble while he's

4  released on conditions, are you willing to call the police, to

5  call Mr. Rapp, to call the Court and say, "I can't do this

6  anymore.  He's going to get into trouble.  I can't be

7  supervising him"?

8  A    Yes, sir.

9  Q    Do you own your house?

10 A    Yes, sir.

11 Q    Are you willing to sign a bond, a promise, that if

12 Mr. Worrell does not come to court, that you'll pay money --

13 A    Most definitely.

14 Q    -- to guarantee that he will appear as required?

15 A    Yes, sir.

16 Q    Okay.

17        **MR. BENNETT:**  I'll pass the witness, your Honor.

18        **THE COURT:**  Mr. Rapp?

19        **THE WITNESS:**  Yes, sir.

20                       **CROSS EXAMINATION**

21 **BY MR. RAPP:**

22 Q    Ma'am, have you ever served as a third-party custodian for

23 him before?

24 A    Yes, sir.

25 Q    And when was that?

Worrell - Redirect / By Mr. Bennett                    65

1  A    That was like, when -- two -- I don't quite remember.

2  Q    Was it the last time he had a Federal case?

3  A    Yes, I served as a custodian.

4  Q    Okay, and that was at some point in 2003 in a Federal case

5  in Houston, Southern District of Texas?

6  A    Yes, sir.

7  Q    Okay, and fact is, during the course of that case, he

8  bench warranted when you were a third-party custodian, did he

9  not?

10  A    He bench what?  Could you explain?

11  Q    Okay.  Well, I'm looking at the paper here.  It says, "On

12  April 5th, 2004, Defendant failed to appear for a Pretrial

13  Conference and a bench warrant was issued."

14         Any reason to disagree that the paper says that?

15  A    I have no reason to disagree.

16  Q    Okay, and no reason to disagree that this is while you

17  were a third-party custodian for him, correct?

18  A    I cannot recall it.

19  Q    Fair enough, ma'am.

20         **MR. RAPP:**  I have no further questions, your Honor.

21         **THE COURT:**  Any further questions, Mr. Bennett?

22                    **REDIRECT EXAMINATION**

23  BY MR. BENNETT:

24  Q    Is there anything different now about your son, Sid, than

25  there was in 2003?  Has anything changed?

1   A    Yes, sir.

2   Q    What?

3   A    He's more loving, obedient.  He listens to his mom because

4   he's the only one I have right now to depend on when I'm sick,

5   and he's there for me.  I can depend on him.

6   Q    He's grown up?

7   A    Yes, sir.

8           **MR. BENNETT:**  I'll pass the witness, your Honor.

9           **THE COURT:**  Any other questions?

10          **MR. RAPP:**  No, your Honor.

11          **THE COURT:**  Okay, thank you, ma'am.  You can step

12  down.

13          **THE WITNESS:**  Thank you.

14      **(Witness steps down)**

15          **THE COURT:**  Okay, what I'm going to do is I'm going

16  to take a short recess.  I need to look at -- organize my

17  notes, look at my notes, and I need to go through the bond

18  reports again.  So it shouldn't be more than -- than maybe 15,

19  20 minutes.

20          So we'll be in recess for about 20 minutes.

21          **MR. BENNETT:**  Judge, can I -- I forgot to ask two

22  questions to Task Force Officer Emmerson.  Can I ask those two

23  questions?

24          **THE COURT:**  No, no.  Everybody's already rested.

25          **MR. BENNETT:**  All right, fair enough.  Would you like

1    argument --

2         **THE COURT:**  No, I usually don't.  I usually normally

3    go with what I got, okay.

4         Thank you.  We'll be in recess for 20 minutes.

5        **(Recess was taken from 4:17 to 4:40 p.m.)**

6         **THE COURT:**  Okay, we're back on the record on the

7    detention hearings in this case.  I'm ready to state my -- my

8    holdings and my findings into the record.

9         Mr. Elizondo, Mr. Aviles, Mr. Lopez, Mr. Worrell, I

10   always -- during the detention hearing, I always address you

11   personally because you have the most to lose or gain on

12   whatever ruling I make in this case.  So I'll explain my

13   decisions in this case so that way you'll know how I stand and

14   the way this goes.

15        First of all, I want to tell you that you're very,

16   very lucky because you have a lot of family support here.

17   Whichever way I go, that means a lot to me.  I tell people all

18   the time, I have people in this courtroom all the time that

19   don't have anybody -- anybody come in and willing to get up on

20   that witness stand and say that they'll take care of them.

21        And so that's huge.  Okay, no matter which way I go,

22   that's huge.  So you're very, very lucky and you need to thank

23   your lucky stars that you have someone in your life that's

24   willing -- willing to do that.

25        Now, so that everyone knows the way the law is, and

1    I'm sure your lawyers have visited with you, is that because of

2    the -- of the amount of drugs that's alleged in this case and

3    because of the indictment in this case, there's two things I

4    need to look at.

5              Whether or not you're a risk of flight and whether or

6    not you're a danger to the community.  Those are the two issues

7    that I need to look at.

8              And so I have to find that you're not on both those

9    before I can release you.  But because of the amount of drugs

10   that's alleged in this case, there's a presumption that you're

11   a risk of flight and there's a presumption that you're a danger

12   to the community.

13             And so that -- that's what we're here for today, to

14   see if you've been able to rebut that presumption, and that's

15   what your lawyers have been doing today with calling witnesses

16   and cross-examining the Government's witnesses.

17             And by the way, they've done an excellent job also.

18   You're lucky to have them on your case also.

19             I'll find, just for the record, that there is

20   probable cause that offense has been committed.  I take into

21   consideration that there's been an indictment returned.  I've

22   also listened to the testimony of the Task Force Officer, James

23   Emmerson.  So for that matter, I do find probable cause.

24             Mr. Elizondo, I'll start out with you because you're

25   the first one that I have to -- first one on the case here.

1          I'll note for the record, and I do know that, in all

2    the cases, I hear amounts of drugs that's allegedly -- people

3    are responsible for.  I know that that's an estimate, that we

4    don't know that.  That's for a jury to decide at trial, or

5    whether or not you're even guilty or whether -- and if so, how

6    much drugs are presented.

7          But long story short, there was a wiretap on

8      Mr. Elizondo's phone.  The agent testified that he was

9    responsible for approximately 19 kilos of cocaine.

10         And then subsequently, there was cocaine and a

11   pistol at a search warrant, subsequent, later on after the end

12   of the conspiracy at his home.

13         Regarding Mr. Elizondo's risk of flight, I find that

14   he's not a risk of flight.  I've gone through the reports.

15   He's been a resident of Houston his whole life; he has family

16   ties to Houston; he's not report outside -- travel outside the

17   United States.

18         I'm going to find that he's rebutted the presumption

19   that he's a risk of flight.  But that doesn't -- in all the

20   cases, that doesn't end the inquiry I have.  I need to look at

21   whether or not he's a danger to the community.

22         Mr. Elizondo, that doesn't -- that doesn't mean that

23   you're going to go out and rob somebody or anything like that.

24   What I need to look at and what I do look at -- these lawyers

25   will tell you; they've been in front of me enough, is I look at

1    a person's track record of how many times they've been on

2    probation or parole or anything else; how many times a judge

3    has told them not to commit another offense.

4           And for whatever reason, sometimes people change.

5    They'll stop, but sometimes they just -- they don't, for

6    whatever reason.  And so I have to look at that.  In doing my

7    job, I have to look at that.

8           And so when I went back through your prior record

9    here, I saw that, at age 19, you got -- you got a DWI.  I

10   didn't count that against you.  But at age 22, in 2003, you got

11   a possession of a controlled substance.  You pled guilty.  You

12   were given probation, but for whatever reason, you were

13   revoked; you didn't successfully serve your probation and you

14   were revoked and you received 12 years in prison.

15          And then shortly after that, in 2004, was a

16   manufacturing and delivery of a controlled substance.  You pled

17   guilty.  You were sentenced and then you were paroled, and then

18   while you were out on parole, apparently, you picked up a

19   possession of a controlled substance and also a possession of

20   marijuana.  You pled guilty on both those and you received some

21   confinement time.

22          So I have to find in looking at your criminal history

23   here, that you've been on -- you've been on probation and

24   you've been on parole and whatever, for whatever reason, that

25   hadn't been able to stop you from committing offenses.

1          So I'm going to find that you haven't rebutted the

2    presumption of being a danger to the community and order you to

3    be held until trial in this case.

4          Regarding Mr. Aviles.  Again, I note that Mr. Aviles

5    was captured on the wiretap -- allegedly captured on the

6    wiretap.  And there was also a search warrant on his residence

7    where two firearms were allegedly recovered, and he is

8    allegedly a convicted felon.

9          Again, I'm going to find Mr. Aviles did rebut the

10   presumption about being a risk of flight.  It looks like he

11   lived in Channelview his whole life; he's expecting a child.  I

12   don't find that there's a risk of flight.

13         But again, what I need to look at is his criminal

14   history to determine whether or not he's rebutted the

15   presumption about being a danger to the community.

16         And at looking at Mr. Aviles's, a lot of the

17   convictions here are old convictions, when you were like 13

18   years old.  I didn't hold a lot of those against you because I

19   know that you were young.

20         But going back, it looks like you had several

21   convictions where you're put on probation for theft when you

22   were 13.  You were sent to TYC for assault causing bodily

23   injury; you caught a burglary of a vehicle -- two burglaries of

24   a vehicle.  You got sent to 180 days in jail in 2003.

25         But most notably, back in 2012, you received two

1    years' imprisonment for being a felon in possession of a

2    firearm.  And then there's probable cause that this offense was

3    committed while you were on parole, and then, even more than

4    that, what's disturbing is the evidence of drugs and firearms

5    at your residence during the search warrant.

6            So again, unfortunately, your criminal history has

7    followed you.  So I'll find that you haven't rebutted the

8    presumption that you're a danger to the community.

9            Ms. Lopez, I find -- I found also that you've been a

10   long-time resident of the Houston area, although you traveled

11   once out of the -- out of the States for apparently some

12   surgery.

13           I find that you rebutted a presumption that you're a

14   risk of flight.  Again, I have to look at the danger to the

15   community.

16           What -- you were a closer call.  And I struggled,

17   okay?  I -- you got a -- you had a forgery of a financial

18   instrument, which is a felony; you received third years -- two

19   years adjudicated probation, and it was extended for another

20   year, but I didn't worry about that.

21           But either way, there was a -- that was a felony.

22   That was back in 2007.  Again, there's probable cause that you

23   committed this offense.  But what worried me more is that

24   apparently, I heard testimony that you were stocked with a

25   large amount of methamphetamine at a border crossing.  And you

1    were detained here several years ago.  And then, for whatever

2    reason, when the authorities ran search warrants on your

3    residence, there was 108 pounds of marijuana and also a firearm

4    found.

5            That should have scared you to death when you were --

6    when you were detained down on the border.  And that should

7    have curtailed your alleged criminal behavior.  But I find that

8    you haven't rebutted that presumption.

9            Regarding -- regarding Mr. Worrell.  Again, I looked

10   back -- same situation.  Mr. Worrell, one of the things I look

11   at is the weight of the evidence against the Defendant.

12           And what went in Mr. Worrell's favor was that I

13   didn't see the culpability there that I saw with the other

14   Defendants either being intercepted on a wire or having a

15   seizure -- things seized from him.

16           But, however, there was probable cause that -- set by

17   the -- by the indictment.  So I had to go back and look at

18   Mr. Worrell's criminal history.  I find that -- and again, I

19   find that he rebutted a presumption that he's not a risk of

20   flight.  He's a long-time resident of the Houston area.

21           But again, I found that Mr. Worrell was convicted of

22   robbery -- robbery back in 1997, possession of a controlled

23   substance in '98; received probation for those two offenses.

24   Criminal mischief in 2000, terroristic threat, and failure to

25   identify as a fugitive from justice; received jail -- jail

1    time.

2           Aggravated assault with a deadly weapon, pled guilty;

3    received two years in prison.

4           And then in 2003, was charged in Federal Court in

5    Houston, Texas, placed on Pretrial Release, in a same issue

6    that we're here, and then failed to show up.  A bench warrant

7    was issued, and was arrested for that.

8           After that -- after serving that term of

9    imprisonment, he picked up a possession of marijuana case in

10   2011.  And also, unlawful possession of a firearm by felon in

11   2015.

12          Unfortunately, Mr. Worrell hasn't rebutted a

13   presumption of being a danger of the community.

14          With regard to these four cases, I remand the

15   Defendants to the custody of the Marshal Service and order that

16   they be held until trial in this case.

17          Thank you.  We're in recess.

18          **THE MARSHAL:**  Court is in recess.

19      **(This proceeding was adjourned at 4:51 p.m.)**

20

21

22

23

24

25

## **CERTIFICATION**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    June 7, 2018

            Signed                                    Dated



                    *TONI HUDSON, TRANSCRIBER*