IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | 1:17-CR-00153 |
| V. | § | |
| ARTURO ELIZONDO | § | HON. THAD HEARTFIELD |

**RESPONSE TO GOVERNMENT'S MOTION TO ADMIT TEXT MESSAGES AND COOPERATING WITNESS TESTIMONY**

TO THE HONORABLE THAD HEARTFIELD:

ARTURO ELIZONDO responds to Government's Motion to Admit Text Messages and Cooperating Witness Testimony (Doc. 289) as follows:

The contents of text messages obtained pursuant to the facially invalid Title III orders as well as all codefendant testimony are the fruit of the suppressed wire communications.

**I.   Standing**

Section 2510(11) defines "aggrieved person" as "a person who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11).

The government's motion establishes that Elizondo was a party to communications intercepted pursuant to the Title III order issued on February 14,

2014, and that Elizondo's phone was the target of the orders issued on March 21 and April 23, 2014. Doc. 289 at 3-4.

Additionally, Elizondo was a named target in the orders issued on March 21, April, 23, May 14, July 2, and August 8, 2014. *See United States v. Oliva*, 705 F.3d 390, 395 (9th Cir. 2012) (defendants who are named targets of a wiretap have standing under Title III); *United States v. Rodriguez*, 2009 WL 2569116, *4 (S.D.N.Y. 2009) (same); *United States v. Asker*, 676 Fed.Appx. 447, 455 (6th Cir. 2017) (same).

## II.     Elizondo's text messages are subject to exclusion.

### A.     Under binding circuit precedent, Title III's exclusionary rule applies to electronic communications.

As noted in the magistrate's report,[1] the Fifth Circuit has stated that Title III's exclusionary rule "applies to communication that is 'wire,' 'oral,' or 'electronic.'" *United States v. Smith*, 978 F.2d 171, 175 (5th Cir. 1992) (internal footnotes omitted). Because the Supreme Court has yet to address this issue, *Smith* governs in this circuit. *See Sturgeon v. Strachan Shipping Co.*, 698 F.2d 798, 800 (5th Cir. 1983) (appellate court panel decisions are binding on district courts within that circuit, as well as subsequent panels).

---

[1] Doc. 201 at 8.

This interpretation finds support in the text of the statute. Section 2510(11) defines "aggrieved person" as "a person who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). The only place the term "aggrieved person" appears in the chapter is in the exclusionary rule of § 2518(10). If Congress had intended for the exclusionary rule to apply only to wire communications there would be no reason for the term "aggrieved person" to include a party to an electronic communication.

### B. The text messages are subject to suppression because they are derived from the suppressed wire communications.

Even if the Court finds that Title III's exclusionary rule does not apply to electronic communications, Title III provides for suppression of "any evidence derived" from an illegal interception. 18 U.S.C. § 2518(10)(a).

Elizondo first became a suspect as a result of several calls and one text message intercepted pursuant to the Title III order for codefendant Alvaro Romero's phone issued on February 14, 2014. These communications served as the basis for a Title III order for Elizondo's phone issued on March 21, 2014. Based on several incriminating phone calls and text messages intercepted pursuant to the March order, the government obtained another Title III order for Elizondo's phone on April 23, 2014, the fruit of which became the basis for a Title III order for codefendant Jose Rubio's phone issued on May 14, 2014.

> **1.   Once the content of illegally intercepted calls is redacted from the March application, the remaining factual basis fails to state probable cause.**

The government asserts that the portions of the invalid orders pertaining to wiretaps can be severed or redacted such that the remainder of the orders pertaining to electronic communications survive untainted. The government also asserts that, because each intercept order yielded incriminating text messages which became part of the basis for the subsequent orders, the subsequent orders derived from a source independent of any illegal wiretap. In addition to the text messages, the government asserts that each phone had "dirty text tolls, meaning the phone being intercepted had text contact with other suspected drug traffickers," which also served as an untainted predicate for the intercept orders.

These arguments must fail as to Elizondo because the suppressed intercepted calls are necessary to satisfy Title III's probable cause requirement for the intercept order for Elizondo's phone issued on March 21, 2014.

Title III requires a judge to find that there is probable cause to believe that "an individual is committing, has committed, or is about to commit a particular offense enumerated" in the statute. 18 U.S.C. § 2518(3)(a). In addition, the statute requires the judge to find that there is probable cause that "particular communications concerning [the] offense will be obtained through" the interception." § 2518(3)(b). Finally, except under circumstances not applicable here, a judge must also find that

there is probable cause to believe "that the facilities from which ... the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used in connection with the commission of such offenses." § 2518(3)(d).

Generally, a judge's decision to issue a warrant based on his determination that probable cause exists is entitled to great deference. *United States v. Phillips*, 727 F.2d 392, 395 (5th Cir.1984). But that is not the case when, as here, the judge never considered the application purged of its tainted material. *See United States v. Kolodziej*, 712 F.2d 975, 977 (5th Cir. 1983). Accordingly, a district court's determination on the issue of residual probable cause dispenses with the usual deferential standard, and a doubtful or marginal case must be resolved in the defendant's favor.

Once the content of the illegally obtained wire interceptions is redacted from the March application, the remainder fails to state probable cause. The factual basis for the March application describes the contents of three intercepted calls to which Elizondo was a party. On February 21, 2014, Elizondo and Romero discussed Elizondo supplying cocaine (referred to as "girl") to Romero and the location for the transaction. In another call on the same date Elizondo asked Romero which drugs he wanted (the "Ross" or the "Deuce"); Romero replied that he wanted the "nina," (Spanish for "girl," meaning cocaine), and that he was on the way to pick it up. In a call on February 25, 2014, Romero asked Elizondo to supply him "nina" (cocaine)

and Elizondo stated that he would instruct his associate "Eddie" to open the garage so Romero could use the back entrance to avoid being seen. *March Application* ¶¶ 48-53.

The March application describes only one text communication involving Elizondo's phone: on February 27, 2014, Romero sent Elizondo a message stating "JUST WAKEN UP BRO GOT UR MONEY." *Id.* ¶¶ 54-55.

As for "dirty text tolls," the March application states that Elizondo's phone had 33 contacts with one suspected drug trafficker, FNU LNU aka "Lito," identified as a drug associate of codefendant Romero. *Id.* ¶ 56-C. Mere contact with a suspected drug trafficker cannot supply probable cause. *United States v. Lopez-Zuniga*, 909 F.3d 906, 910 (8th Cir. 2018) (warrant was so lacking in indicia of probable cause that belief in its existence would have been entirely unreasonable where factual basis was limited to cellphone toll records showing that defendant had 154 "contacts" with a suspected drug trafficker but affidavit did not establish that the contacts involved something criminal).

The three illegally intercepted calls involving discussions of presumed drug transactions using code words are far more incriminating than the single text message describing a one-time payment of money. Without the intercepted calls for context, the single text message does not provide probable cause to support the warrant. The text message alone is ambiguous because there are many reasons a

person might owe someone money. Hence, the February 25 call in which Romero arranges to pick up "nina" is essential to contextualize the text message two days thereafter in which Romero informs Elizondo that he has Elizondo's money. Moreover, there is nothing in the text message about the amount of money owed that could create suspicion, nor is there any indication from the single text message that the payment was one of many transactions so as to demonstrate a pattern of suspicious behavior. The illegally intercepted calls were critical in establishing the basis for the March intercept order. In fact, the government concedes in its motion that the intercepted calls "helped agents understand the text messages better."

    The remaining factual basis— one ambiguous text message and toll records showing contacts with one suspected drug trafficker—fails to establish probable cause that Elizondo's phone was being and would be used to commit the specified narcotics offenses. Accordingly, the entire March intercept order for Elizondo's phone is invalid, and the single text message described in the application cannot be deemed an "independent source" that salvages the March order.

    The government has the burden to demonstrate by a preponderance of the evidence an independent source for all evidence introduced. *United States v. Seiffert*, 501 F.2d 974, 982 (5th Cir. 1974). It cannot meet this burden with regard to the March application for Elizondo's phone without fulfilling Title III's probable cause requirements. Likewise, the severance doctrine is applicable only if probable cause

existed for some portion of the order. *See United States v. Oglesby*, 4:18-CR-0626, 2019 WL 1877228, at *9 (S.D. Tex. Apr. 26, 2019) ("Severance cannot create probable cause or particularity where there is none.").

> 2. **All text messages intercepted subsequent to the invalid March order are fruits of the poisonous tree.**

Because the March order lacked residual probable cause and cannot be saved by the independent source or severance doctrines, all evidence—including text messages—obtained pursuant to the March order must be suppressed as the direct, unattenuated products of the illegal interceptions.[2]

Because evidence derived from the invalid March order served as the predicate for the April order, its products must also be suppressed unless the April application supplies residual probable cause. The April application describes the content of eight phone calls and three text messages intercepted from Elizondo's phone, all of which must be redacted as fruit of the invalid March order. *April Application* ¶¶ 19-40. The application also describes the content of three calls between Elizondo and Romero which are included as the factual basis for the interception of Romero's phone, but these must be suppressed due to the facial insufficiency of the order. *Id.* ¶¶ 41-46. The April application does not include any

---

[2] Because all evidence obtained pursuant to the March order as to Elizondo's phone must be suppressed, the attenuation doctrine is inapplicable because the government's claim of attenuation is rests on the premise that agents fully complied with statutory requirements for electronic communications, creating an "unbroken chain" of untainted text messages. *See* Doc. 289 at 7.

toll information for Elizondo's phone, nor any other facts pertinent to Elizondo from any untainted source. Accordingly, the April application fails to supply residual probable cause once the tainted portions are redacted, and is thus invalid in its entirety.

Likewise, all evidence derived from the order issued on May 14, 2014, for interception of the phone used by codefendant Jose Rubio, is poisonous fruit. The May application describes the content of three calls between Elizondo and Rubio, which must be suppressed due to the facial insufficiency of the order and also as evidence derived from the invalid March and April orders. *May Application* ¶¶ 19-22; 27-28. The May application also describes the content of one text conversation consisting of two messages between Elizondo and Rubio, which must be suppressed as evidence derived from the invalid March and April orders. *Id.* ¶¶ 23-26. All that remains is toll records showing contacts between Rubio and one suspected drug trafficker, which is insufficient to establish probable cause. *Id.* ¶ 29-C. Accordingly, all evidence derived from the May application is inadmissible against Elizondo.

    **C.**    **The text messages are subject to exclusion because the government is required to comply with the statutory requirements applicable to wire communications when applying for a hybrid order.**

When first enacted, Title III addressed only the interception of wire and oral communications. Title III was amended in 1986 by the Electronic Communications Privacy Act ("ECPA") of 1986, Pub. L. No. 99–508, 100 Stat. 1848 (1986), to

expand certain protections previously only provided to wire and oral communications to now include electronic communications. *See*, *e.g.*, 18 U.S.C. § 2511(1)(a),(c), (d) and (e) (penalizing unauthorized interception of wire, oral and electronic communications).

The legislative history of the 1986 amendments indicates that Congress contemplated that applications for hybrid orders authorizing interception of both wire and electronic communications would satisfy the standards required for wire communications. A House Judiciary Committee Report on ECPA states that: "The Committee understands that [DOJ] will apply for a court order under the 'wire' standards in cases where a tap may intercept mixed wire and electronic communications," and "[a]s long as the wire standards are followed a single court order should suffice to authorize the interception of both wire and electronic communications involving the same lines of instruments." H.R. REP. NO. 99–647, at 35–36 (1986). This statement cautions the government to err on the side of fulfilling the more stringent requirements when seeking a hybrid order and forecloses the application of the severance doctrine when both wire and electronic communications have been intercepted without complying with the wire standards.

A district court has acknowledged that this legislative history "may bear on situations in which the government is actually seeking to capture both electronic and wire forms of communications." *United States v. Apodaca*, 287 F. Supp. 3d 21, 34

(D.D.C. 2017). In *Apodaca*, however, the government's applications sought only the interception of text messages and it only inadvertently intercepted wire communications. The telecommunications provider forwarded text message data to the government without first disaggregating audio files, known as "voice notes," transmitted over the same network. *Id.* at 28. The government took appropriate steps to minimize the wire communications it received: monitors were instructed verbally and in writing not to listen to any unauthorized intercepted wire communications. *Id.* at 28, 34. The *Apodaca* court held that, because the government sought to intercept only electronic communications and took appropriate steps to minimize wire communications, the Title III applications were not invalid for failing to meet the statutory requirements for wiretaps, specifically, authorization by a designated high-level DOJ official pursuant to § 2516(1). *Id.* at 35.

Unlike in *Apodaca*, the applications in this case expressly sought authorization to intercept both wire and electronic communications, and there were no efforts to minimize any unauthorized intercepted wire communications. Accordingly, the government was required to satisfy the more stringent requirements for the hybrid orders and cannot rely on the severance doctrine.

## III. The codefendant testimony is fruit of the poisonous tree.

### A. The causal connection between the illegal wiretaps and the prosecution of the codefendants is clear and direct.

The government asserts that the illegal wiretaps are "unrelated" to the codefendants' decisions to cooperate. It claims that there is "no connection" between the wiretaps and the cooperation of codefendants Romero, Lopez, and Rodriguez because (1) there was untainted evidence against Romero: a CS made drug purchases from Romero before the interceptions began; (2) Lopez and Rodriguez did not join the motion to suppress; and (3) codefendants Romero and Lopez had begun the process of cooperating (by debriefing with prosecutors) prior to the filing of the motion to suppress.

But the Title III applications make it clear that the cases against the codefendants, and hence their decision to cooperate, are a direct result of the illegal wiretaps. In fulfillment of Title III's necessity requirement, *see* 18 U.S.C. § 2518(1)(c),[3] each application states that the wiretaps are necessary because the full

---

[3] Section 2518(1)(c) requires that each affidavit in support of an application for a wiretap contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." This "necessity" requirement was included in the statute in order to prevent wiretapping from being utilized in cases where "traditional investigative techniques" are sufficient. *See United States v. Collins*, 927 F.2d 1385, 1412 (5th Cir. 1992). As the Supreme Court explained in *United States v. Giordano*, 416 U.S. 505, 515, 94 S. Ct. 1820, 1826-27, 40 L. Ed. 2d 341 (1974), Congress intended to "make doubly sure that the statutory authority for wiretaps be used with restraint and only where the circumstances warrant surreptitious interception of wire and oral communications" and thus included a necessity requirement as a means to protect against the use of a wiretap as the "initial step in a criminal investigation."

scope of the organization had not been revealed, "**nor has court room quality evidence been found sufficient to charge the Target Subjects**."[4] These statements were not only sworn to by the drafting agent, they were fully reviewed and adopted by two government lawyers: the Special Assistant United States Attorney who submitted each application and the Deputy Assistant Attorney General who approved them. These statements amount to a concession that, but for the wiretaps, these defendants would never have been charged, nor would the government have had any competent evidence to use as leverage in securing their cooperation.

Moreover, the applications establish that the wiretaps were the sole means by which the government learned the identity of Elizondo and his relationship with Romero. The application for February Title III order, through which Elizondo was first identified, states that "[i]nformation obtained from the seizures … have not yet permitted investigating agents to identify all the co-conspirators involved in this organization" and that interception is needed "to identify the source of supply" (¶ 42). Based on calls intercepted pursuant to the February order, agents were able to identify Elizondo as Romero's cocaine source and a marijuana customer. *See* March Application at ¶ 11-G ("Intercepted calls over Target Device #1 indicate that

---

[4] *See* February Application at ¶ 42; March Application at ¶ 58; April Application at ¶ 56; May 5 Application at ¶ 67; May 14 Application at ¶ 31; July Application at ¶ 34, August Application at ¶ 45).

Arturo LNU, who was using Target Device #2, is a cocaine source for ROMERO. Arturo LNU also purchases marijuana from ROMERO").

The fact that the codefendants Rodriguez and Lopez did not join the motion to suppress and that codefendants Rodriguez, Lopez and Romero had debriefed with prosecutors prior to its filing does not attenuate the link between the illegally obtained evidence and their cooperation. The timing of these events demonstrates only that they did not know that Title III orders were facially insufficient until it was too late—they had already begun the process of cooperation and incriminated themselves (and, in the case of Romero, pleaded guilty). It does nothing to refute the fact that the indictments against the codefendants and their subsequent cooperation were secured only as the result of the illegal surveillance.

The Government bears the burden of demonstrating attenuation. *United States v. Mendez*, 885 F.3d 899, 908 (5th Cir. 2018). The attenuation determination is a fact sensitive inquiry. *United States v. Miller*, 608 F.2d 1089, 1102 (5th Cir. 1979). The government has not submitted affidavits or any other evidence showing (1) that the codefendants would have been charged even in the absence of the wiretap evidence, (2) that their cooperation was unaffected by the illegally obtained evidence, or (3) that the codefendants were not confronted with the content of the wiretaps in the course of their cooperation and in preparation for testifying. *See United States v. Rubalcava-Montoya*, 597 F.2d 140, 143 (9th Cir. 1978) (excluding testimony as

poisonous fruit where the record did not show the substance or extent of any conversations or negotiations between the government and the witnesses, and thus the government had not rebutted the logical inference that the incriminating evidence discovered in the course of the illegal search was used to persuade the witnesses to testify). The government has not met its evidentiary burden.

### B. *Ceccolini* is distinguishable.

The government relies primarily on *United States v. Ceccolini*, 435 U.S. 268 (1978), in support of its argument that "a closer, more direct link between the illegality and that kind of testimony is required." *Id.* at 278.

But the *Ceccolini* decision hinged on a critical fact not present here: the witness was an innocent third party who had nothing to do with Ceccolini's illegal activities. The illegal search occurred in Ceccolini's flower shop, which had been under investigation for gambling activities. An off-duty police officer was behind the counter speaking with a personal friend who worked at the shop. 435 U.S. at 270. The officer noticed an envelope near the cash register and, without the employee noticing, looked inside, discovering money and gambling paperwork. *Id.* Without telling the employee what he had seen, the officer asked who it belonged to, and the employee said it belonged to Ceccolini. *Id.* Because of this discovery, an FBI agent interviewed the employee several months later. Ceccolini was tried and convicted for perjury after denying involvement in gambling activities before a grand jury, and

the employee's testimony was the principal evidence against Ceccolini at his perjury trial. *Id.* at 268. But the district court thereafter concluded that the employee's testimony was the fruit of the illegal search of the envelope and set aside the verdict. *Id.* at 270.

The Supreme Court held that the employee's testimony was attenuated from the illegal search for several reasons. Most importantly, the employee's cooperation with the authorities was in no way induced by the illegal search, nor were the envelope's contents used in questioning the employee. *Id.* at 279. The Court emphasized that "the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify." *Id.* at 277. The Court also observed that the identity of the witness and her relationship with Ceccolini "were well known to those investigating the case" well before the illegal search took place. *Id.* at 279–80. Additionally, there was nothing to suggest that the officer searched the envelope with the intent of finding a witness against Ceccolini. *Id.* at 280.

Elizondo's case is distinguishable on every pertinent factor. First, the cases against the codefendants, and hence their desire to cooperate, were a direct result of the illegal wiretaps; there is nothing to suggest that the codefendants would have come forward to assist the prosecution of their own volition. *See United States v. Crews*, 445 U.S. 463, 471–72, 100 S. Ct. 1244, 1250, 63 L. Ed. 2d 537 (1980) (noting

that suppression of testimony is appropriate if the witness's cooperation was "secured only as a result of an unlawful search or arrest of the accused"). The *Ceccolini* Court recognized that its analysis may be logically limited to cases in which the witness "was not a putative defendant." *Id.* at 275. The Court admonished that if the derivative statements/testimony are made "by a putative defendant after arrest," courts should consider the extent to which the illegal search impacted the "free will" of the witness; otherwise, police would be incentivized to conduct illegal searches to discover witnesses. *Id.* at 276. Second, the relationship between the cooperating codefendants and Elizondo was not known to the authorities before illegal wiretaps. Third, the illegal searches in this case were conducted for the express purpose of finding incriminating evidence, and there was nothing serendipitous about the government's discovery of incriminating conversations and its identification of defendant-witnesses through the illegal surveillance. The Supreme Court acknowledged that, although courts should be more reluctant to suppress live witness testimony than tangible evidence, "the analysis might be different where the search was conducted by the police for the specific purpose of discovering potential witnesses." *Ceccolini*, 435 U.S. at 276 n. 4.

Third-party testimony has been suppressed as a poisonous fruit under *Ceccolini* where, as here, the witness was a person implicated in the criminal activity revealed by the initial illegality, because such a witness would not have come

forward voluntarily or been discovered through another source. In *United States v. Ienco*, 182 F.3d 517, 530-31 (7th Cir. 1999), an illegal arrest of Ienco and codefendant Iovine led to the search of their rented van, in which the police found guns and a briefcase. During subsequent questioning Iovine directed police to their motel room, in which police found more incriminating evidence. After the district court denied their joint motion to suppress, Iovine negotiated a plea agreement and testified at trial against Ienco, who was convicted of extortion related crimes. *Id.* at 522. After considering the factors discussed in *Ceccolini*,[5] the Seventh Circuit found that both Iovine's statements and his testimony were not attenuated from the illegal arrests and thus subject to suppression. Iovine's confession and trial testimony were made only after the district court denied the motion to suppress. Accordingly, "he was not speaking of a free will uninfluenced by the initial illegality. Rather, his actions appear dictated by his own precarious legal situation—a circumstance forged by the illegal arrest and search." *Id.* at 530. Also, the tainted evidence was used in questioning Iovine and the government failed to rebut the logical inference that the tainted evidence was used to persuade him to testify. *Id.; see alo United States v.*

---

[5] The Seventh Circuit set out the *Ceccolini* factors as (1) whether the testimony given by the witness was an act of free will or coercion or induced by official authority as a result of the initial illegality, id. at 276, 98 S.Ct. 1054; (2) whether the illegality was used in questioning the witness, id. at 279, 98 S.Ct. 1054; (3) how much time passed between the illegality and contact with the witness and between the contact and the testimony, id.; (4) whether the identity of the witness was known to the police before the illegal conduct, id.; and (5) whether the illegality was made with the intention of finding a witness to testify against the defendant. 182 F.3d at 530, citing *Ceccolini* at 280.

*Rubalcava-Montoya*, 597 F.2d 140, 143 (9th Cir. 1978) (suppressing the testimony of the illegal aliens who testified against the appellants in alien smuggling case because "not only were [the witnesses] discovered as a direct result of the illegal search but were implicated thereby in illegal activity"); *United States v. Karathanos*, 531 F.2d 26, 35 (2d Cir. 1976) (in a prosecution for harboring and concealing illegal aliens, testimony of illegal aliens was procured by an illegal search and the government's promise not to prosecute, so the witnesses' decisions to testify could not accurately be characterized as intervening acts of free will); *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1398 (9th Cir. 1989) (same); *c.f. Satchell v. Cardwell*, 653 F.2d 408, 409-10 n. 7 (9th Cir.1981) (unlike persons implicated in illegal activity, brutally beaten multiple-rape victim probably would have come forward to testify even if she had not been discovered as result of illegal entry).

This issue is more clear in the instant case because there is more than just a "logical inference" that the tainted evidence was used to persuade the codefendants to testify—sworn statements adopted by the government establish that the wiretaps provided the sole competent evidence against the codefendants. Because the cooperation of the codefendants was induced by the illegal surveillance, the relationship between the codefendants and Elizondo was discovered through the illegal surveillance, and the illegal surveillance was conducted for the express

purpose of finding incriminating evidence against the targets, the testimony of the codefendants must be suppressed.

## CONCLUSION

Defendant Arturo Elizondo respectfully requests that the Court find that all text messages and all co-defendant testimony proposed to be offered by the Government are fruit of the suppressed wire communication and therefore deny the Government's motion to admit text messages and cooperating witness testimony.

Respectfully Submitted,

s/ Daphne Pattison Silverman
TBN 06739550
Silverman Law Group
501 North IH-35
Austin, Texas 78702
512-975-5880
daphnesilverman@gmail.com
Attorney for Defendant
Arturo Elizondo

## Certificate of Service

The undersigned counsel hereby certifies that a copy of the foregoing motion was served via email upon the following parties on June 11, 2019.

Cristopher Rapp, Assistant U.S. Attorney
Christopher.T.Rapp@usdoj.gov

s/ Daphne Pattison Silverman